## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EVA CARDOZA, | ) | 3:22-CV-00591 (SVN) |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIMETHEA PULLEN, PATRICK | ) | |
| McFARLAND, and MICHAEL | ) | August 9, 2022 |
| CARVAJAL, | ) | |
| *Respondents*. | ) | |

## **RULING AND ORDER ON RESPONDENTS' MOTION TO DISMISS**

Sarala V. Nagala, United States District Judge.

Petitioner Eva Cardoza has filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, claiming that the federal Bureau of Prisons ("BOP") violated her constitutional and statutory rights by redesignating her from home confinement to incarceration at a federal facility without providing her with a fair hearing or access to counsel. The petition consists of six counts: (1) violation of procedural due process; (2) violation of substantive due process; (3) violation of the Eighth Amendment; (4) violation of BOP regulations pursuant to the *Accardi* doctrine; (5) violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*; and (6) a claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* Petitioner seeks declaratory and injunctive relief, as well as enlargement of her custody to home confinement pending the resolution of her claims.

Respondents Timethea Pullen, Patrick McFarland, and Michael Carvajal—all of whom serve within the BOP—have moved to dismiss the petition, claiming that Petitioner has failed to exhaust her administrative remedies and failed to state a claim upon which relief may be granted. Respondents' argument that Petitioner has failed to state a claim focuses primarily on the assertions that Petitioner's reimprisonment does not trigger due process protections or rise to the

level of an Eighth Amendment violation; that this Court lacks the authority to return Petitioner to home confinement; and that Petitioner does not identify any regulations governing her reimprisonment that the BOP neglected to follow. Petitioner argues that she is excused from exhausting her administrative remedies, that her reincarceration triggers due process protections, and that BOP regulations governing disciplinary proceedings applied to her reimprisonment.

For the reasons described below, the Court agrees with Petitioner that she is excused from exhausting her administrative remedies. The Court agrees with Respondents, however, that Petitioner has not plausibly alleged that her reimprisonment triggered due process protections or that it rose to the level of an Eighth Amendment violation. The Court further agrees with Respondents that Petitioner identifies no regulations that the BOP neglected to follow when revoking her home confinement. Accordingly, Respondents' motion to dismiss is GRANTED and the petition is DISMISSED without prejudice to refiling within 30 days. Because the petition is dismissed in full, Petitioner's request for provisional enlargement to home confinement pending the resolution of her claims is DENIED as moot.

## I.     FACTUAL BACKGROUND

The following allegations, drawn from the petition and the exhibits that accompany it, are taken as true for purposes of Respondents' motion to dismiss.[1] Petitioner is currently incarcerated at the Federal Correctional Institution Danbury ("FCI Danbury"), where she is serving a sentence following convictions for racketeering conspiracy, conspiracy to distribute narcotics, and managing a drug premises. Petition ("Pet."), ECF No. 1, ¶ 5 & n.2. Petitioner's prison sentence is scheduled to expire on or around December 2, 2024. *Id.* ¶ 23.

---

[1] When considering a motion to dismiss a federal habeas petition for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded factual allegations in the petition as true and draw all reasonable inferences in favor of the petitioner. *Williams v. Breslin*, 274 F. Supp. 2d 421, 425 (S.D.N.Y. 2003).

In May of 2020, after Petitioner served a portion of her sentence at FCI Danbury, the BOP redesignated her to home confinement pursuant to its expanded authority under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020). *Id.* ¶¶ 13–14. The BOP's decision to place Petitioner in home confinement was based on her low public safety risk and the dangers of the COVID-19 pandemic. *Id.* ¶ 14.

Petitioner remained in home confinement for more than a year, during which time she cared for her teenage daughter, preteen and teenage stepchildren, diabetic mother, and seriously ill fiancé. *Id.* ¶ 1. Petitioner's fiancé suffers from coronary heart disease and an enlarged heart, which leaves him physically weakened and often renders him unable to care for himself. *Id.* ¶ 22. Petitioner's home confinement allowed her to care for her fiancé by overseeing his medications and by feeding and bathing him. *Id.* Petitioner also helped her mother with housework and cooking. *Id.*

Petitioner's period of home confinement was supervised by the Bronx Community Reentry Center (the "RRC"), an entity that contracts with the BOP to provide such supervision. *Id.* ¶ 19. Throughout her time on home confinement, Petitioner was required to report to the RRC between one and four times per month. *Id.* ¶ 20. While she was in home confinement, the RRC tested Petitioner for controlled substance use once per month. *Id.* ¶ 21. Prior to June 1, 2021, Petitioner had received no incident reports from the BOP asserting that she had violated any BOP rules. *Id.*

On June 7, 2021, RRC staff informed Petitioner that her urine sample collected on June 1, 2021, had tested positive for marijuana. *Id.* ¶ 24. Petitioner was instructed to report to the RRC, where she was provided with an incident report charging her with violating Code 112 of the BOP's Inmate Discipline Program, which prohibits the use of any narcotics or related paraphernalia not prescribed by medical staff. *Id.* ¶¶ 24–25. After she received the incident report, RRC staff

informed Petitioner that they were recommending that she lose forty-one days of good time credit as a sanction for her violation, but that they were not recommending reimprisonment at a federal facility. *Id.* ¶¶ 26–27. Petitioner alleges, however, that when she met with RRC staff on June 7, 2021, the BOP had already determined that she would be reincarcerated. *Id.* ¶ 28. Specifically, Petitioner alleges that on the morning of June 7, Respondent McFarland sent an email to RRC staff indicating that Petitioner's home confinement would be revoked and that she would be remanded to prison. *Id.* ¶ 28 & n.6.

On June 8, 2021, a Disciplinary Hearing Officer ("DHO") determined—without providing Petitioner an opportunity to be heard—that Petitioner would lose forty-one days of good time credit for her violation of Code 112. *Id.* ¶ 29. However, the DHO did not indicate that Petitioner's home confinement would be revoked. *Id.* On or around the same day, Petitioner was instructed to report to the RRC and told that she would be staying there for a long period of time. *Id.* ¶ 30. Soon after Petitioner reported to the RRC, U.S. Marshals detained her and took her to the Metropolitan Detention Center Brooklyn ("MDC Brooklyn"). *Id.* ¶ 31. On August 25, 2021, Petitioner was transferred to FCI Danbury, where she remains incarcerated. *Id.* ¶ 32.

Petitioner contends that she did not receive written notice of the BOP's decision to reimprison her, that she was unable to present evidence in support of remaining on home confinement, that she was not provided with an explanation of the reasoning and evidentiary basis for the BOP's decision, that the determination was not made by a neutral and detached decisionmaker, and that she was given conflicting information about the length of her reimprisonment. *Id.* ¶¶ 33–34, 36–37.

Moreover, Petitioner alleges that, despite her efforts to bring her complaints regarding her reimprisonment to the BOP's attention, she was prevented from doing so. *Id.* ¶ 50. Specifically,

Petitioner avers that U.S. Marshals prohibited her from taking her incident report and appeals paperwork with her from the RRC to MDC Brooklyn.  Cardoza Decl., ECF No. 1-2, ¶ 29; Pet. ¶ 51.  Then, after she arrived at MDC Brooklyn, BOP staff refused to provide her with these materials.  Cardoza Decl. ¶¶ 29–30; Pet. ¶ 51.  Later, when Petitioner arrived at FCI Danbury, she once again requested her incident report and appeals paperwork, but BOP staff told her that her time for an appeal had passed.  Cardoza Decl. ¶ 31; Pet. ¶ 51.  Despite being denied an administrative remedy form, Petitioner submitted a written appeal to the BOP Regional Director on September 21, 2021, but received no response.  Cardoza Decl. ¶¶ 31–32; Pet. ¶ 51.  At oral argument, Petitioner's counsel stated that Petitioner also wrote to the BOP's General Counsel on May 31, 2022.  Petitioner received a response to that letter on July 30, 2022, stating that the grievance was being rejected because it should have been submitted to FCI Danbury.  ECF No. 31.

Shortly after Petitioner was reincarcerated, her daughter was sexually assaulted.  *Id.* ¶ 41.  The perpetrator of the sexual assault was convicted, *id.*, and Petitioner's daughter was expected to provide a victim impact statement at the sentencing.  Petitioner's daughter has experienced a deterioration of her physical and mental health since the assault and Petitioner's reincarceration.  *Id.*  Petitioner contends that her children, her fiancé, and her mother are suffering without her care and support.  *Id.* ¶¶ 41–43.

Petitioner further contends that her inability to care and provide for her family has had a detrimental impact on her own health.  *Id.* ¶ 44.  As a result of abuse she has experienced throughout her life, Petitioner, who was forty-four years old at the time she filed her petition, suffers from asthma, seizures, and post-traumatic stress order ("PTSD").  *Id.* ¶¶ 5, 15.  In her petition, Petitioner describes witnessing her father physically and emotionally abuse her mother

and discusses how she was later abused by her father, beaten and raped as a young woman, and involved in multiple physically abusive relationships. *Id.* ¶ 15. During one attack, Petitioner's abuser struck her in the head, resulting in a serious injury that has caused Petitioner to experience seizures triggered by anxiety and stress. *Id.* Petitioner has been on social security disability since her seizures became disabling. *Id.* ¶ 16.

Since being reincarcerated at FCI Danbury, Petitioner has suffered from PTSD, seizures, extreme stress, depression, anxiety, anguish, and the effects of her asthma. *Id.* ¶ 44. Petitioner appears to contend that at least some of these conditions are disabilities, though she does not specify which ones. *See id.* ¶¶ 35, 71–72. She asserts that her continued incarceration will cause irreparable harm to the well-being of both her and her family. *Id.* ¶¶ 46–47.

## II.     LEGAL STANDARD

Section 2241 grants federal courts jurisdiction to issue writs of habeas corpus to prisoners "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A writ of habeas corpus under § 2241 "is available to a federal prisoner who does not challenge the legality of his sentence, but challenges instead its execution subsequent to his conviction." *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001). An inmate may challenge under § 2241, for example, "such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001).

The Court reviews a motion to dismiss a habeas petition according to the same principles as a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)(6). *Dimartino v. Sage*, No. 3:21-CV-00498 (KAD), 2022 WL 124308, at *2 (D. Conn. Jan. 13, 2022); *Stinson v.*

*Williams*, No. 3:16-cv-1415 (AWT), 2017 WL 2126592, at *1 n.1 (D. Conn. May 16, 2017).

Pursuant to Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which

relief can be granted."  When determining whether a complaint states a claim upon which relief

can be granted, highly detailed allegations are not required, but the complaint must "contain

sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

For purposes of this examination, "the complaint is deemed to include any written instrument

attached to it as an exhibit or any statements or documents incorporated in it by reference."

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  Additionally, a court may

consider documents on which the complaint "relies heavily," which can render the documents

"integral" to the complaint.  *Id.* at 153.

      "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.  This plausibility standard is not a "probability requirement," but imposes

a standard higher than "a sheer possibility that a defendant has acted unlawfully."  *Id.*  However,

legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements" do not suffice.  *Id.* (citing *Twombly*, 550 U.S. at 555).  In reviewing a

motion to dismiss, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume

all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to

an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal

quotation marks omitted).

### III.    EXHAUSTION

The Court first addresses whether Petitioner has failed to exhaust her administrative remedies, and if so, whether her failure to exhaust is excused.  Petitioner argues that she is not bound by the exhaustion requirements of the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and that she is excused from the judicially created exhaustion requirements that apply to § 2241 petitions.  Respondents disagree with Petitioner on both points.  The Court agrees with Petitioner.  Accordingly, the Court declines to dismiss the petition on exhaustion grounds.

### A.  Exhaustion Under the PLRA

At the outset, the Court rejects Respondents' contention that the PLRA's exhaustion requirements apply in this case.  There is no statutory requirement that an inmate exhaust administrative remedies before filing a habeas petition pursuant to § 2241.  *See Carmona*, 243 F.3d at 634 ("[A]lthough § 1997e(a) of the [PLRA] contains a statutory administrative exhaustion requirement, we have held, in the context of a § 2254 petition, that the requirements of the Act do not apply to habeas proceedings. . . . Doubtless the same rule should obtain in § 2241 cases as in § 2254 petitions.").  Courts in this Circuit have repeatedly reaffirmed *Carmona*'s holding in this regard.  *See, e.g.*, *Lallave v. Martinez*, ___ F. Supp. 3d ___, 2022 WL 2338896, at *8 (E.D.N.Y. June 29, 2022) ("Section 2241's exhaustion requirement is 'prudential, not statutory.'"); *United States v. Basciano*, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2005) (finding "the statutory exhaustion requirement set forth under the [PLRA]" inapplicable to § 2241 petition); *Perez v. Zenk*, No. 04-CV-5069 (CBA), 2005 WL 990696, at *2 (E.D.N.Y. Apr. 11, 2005) (noting that the exhaustion requirement for § 2241 petitions "is not grounded in § 1997e, but rather in the common law").

The Court is not persuaded by Respondents' argument that dicta in *Jones v. Smith*, 720 F.3d 142, 145 n.3 (2d Cir. 2013), suggests that the PLRA's exhaustion requirements apply where

a § 2241 petition challenges conditions of confinement.  Respondents focus on the discussion in the *Jones* decision of *Reyes v. Keane*, 90 F.3d 676, 678 (2d Cir. 1996), which held that habeas petitions are not civil actions covered by the PLRA.  In *Jones*, the Second Circuit "assume[d] without deciding" that the *Reyes* holding pertained to habeas corpus petitions that "challenge criminal convictions and sentences, and not petitions, sometimes brought under 28 U.S.C. § 2241, that complain of conditions of confinement." *Jones*, 720 F.3d at 145 n.3.  Respondents interpret this language to mean that the PLRA's exhaustion requirements do, in fact, apply to § 2241 petitions challenging conditions of confinement.

Respondents cite no case in which a court has interpreted *Jones* as applying to exhaustion of a § 2241 petition in the manner they propose.  To the contrary, in the wake of *Jones*, courts in this Circuit have continued to hold that the PLRA's exhaustion requirements do *not* apply to § 2241 petitions, including petitions that challenge conditions of confinement. *See, e.g.*, *Anderson v. Williams*, No. 3:15CV1364 (VAB), 2017 WL 855795, at *6 (D. Conn. Mar. 3, 2017) (holding, in a habeas matter involving conditions of confinement, that "[t]here is no statutory requirement that an inmate exhaust administrative remedies before filing a section 2241 petition"); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 437 n.19 (D. Conn. 2020) (characterizing assertion that the exhaustion requirement of the PLRA applies to habeas proceedings as "an inaccurate statement of the law in the Second Circuit").[2]

Regardless, in *Jones*, the Second Circuit did not overrule or limit its holding in *Carmona*, 243 F.3d at 634, that the PLRA's exhaustion requirements do not apply to § 2241 petitions.  Indeed,

---

[2] Respondents cite *Dimartino*, 2022 WL 124308, at *3–6, in which the district court concluded that the requirements and limitations of the PLRA applied to a § 2241 petition challenging conditions of confinement.  However, the district court in *Dimartino* did not address the specific issue of exhaustion, and as a result, did not need to confront the well-established rule in this Circuit that the exhaustion requirements of the PLRA do not apply to § 2241 petitions.  Despite the incongruities that may result from the fact that courts have begun to consider whether certain provisions of the PLRA apply to § 2241 petitions, the Court is bound by the controlling authority dictating that the exhaustion requirements that apply to § 2241 petitions are prudential, rather than statutory.

neither *Jones* nor *Reyes* discuss exhaustion. Rather, in dicta confined to a footnote, the Second Circuit assumed *without deciding* that the *Reyes* holding did not pertain to all § 2241 petitions. *Jones*, 720 F.3d at 145 n.3. Absent controlling authority to the contrary, the Court is bound by *Carmona*'s clear holding, which remains the controlling rule in this Circuit. *See Anderson v. Recore*, 317 F.3d 194, 201 (2d Cir. 2003) (unless a Supreme Court decision or an *en banc* holding of the Second Circuit implicitly or explicitly overrules Second Circuit precedent, district courts are not free to ignore it). The Court rejects Respondents' invitation to hold otherwise.

Accordingly, the PLRA did not require Petitioner to exhaust her administrative remedies before filing her petition.

B. Judicial Exhaustion

The Second Circuit has, however, imposed a judicial exhaustion requirement that applies where a § 2241 petitioner challenges her conditions of confinement. *See Carmona*, 243 F.3d at 634. In other words, the exhaustion requirement for § 2241 petitions is "prudential, not statutory." *Zucker v. Menifee*, No. 03 CIV. 10077 (RJH), 2004 WL 102779, at *4 (S.D.N.Y. Jan. 21, 2004). The burden of demonstrating exhaustion of administrative remedies rests with the § 2241 petitioner. *Spring v. Schult*, No. 908-CV-0531 (LEK), 2009 WL 3232183, at *1 (N.D.N.Y. Oct. 1, 2009).[3]

While statutory exhaustion requirements are mandatory, the common law (or "judicial") exhaustion doctrine "recognizes judicial discretion to employ a broad array of exceptions that

---

[3] On July 27, 2022, Petitioner filed a "Notice of Administrative Exhaustion," contending that she has now exhausted her administrative remedies because her letter to the BOP's General Counsel has been unanswered for 40 days. ECF No. 30. On August 1, 2022, Petitioner filed a supplemental notice, providing that her case manager gave her, on July 30, 2022, the BOP's response to the grievance form she had mailed to the BOP General Counsel. ECF No. 31. The BOP's response, which was dated July 8, 2022, stated that the grievance was being rejected because it should have been submitted to the institution, FCI Danbury. *Id.* Because the Court finds that an administrative appeal would be futile, it need not reach the questions of the effect of the BOP's response dated July 8, 2022, and whether exhaustion of remedies while a suit is pending fulfills the prudential exhaustion requirement.

allow a plaintiff to bring [her] case in district court despite [her] abandonment of the administrative review process." *Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir. 1998). Thus, because the exhaustion requirement for § 2241 petitions is judicially, rather than statutorily, imposed, a court has discretion to excuse a petitioner's failure to exhaust administrative remedies. *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), *as amended* (July 24, 2003). The Second Circuit has held that exhaustion may be excused when: "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Id.* (quoting *Able v. United States*, 88 F.3d 1280, 1288 (2d Cir. 1996)). Petitioner argues that the first three exceptions apply here.[4]

The Court finds that Petitioner is excused from exhausting her administrative remedies because exhaustion would be futile, and, thus, the Court need not reach the other exceptions. "[E]xhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Washington*, 925 F.3d at 118. The Second Circuit has emphasized the importance of viewing the futility exception in light of the purposes of administrative exhaustion, which include "protecting the authority of administrative agencies, limiting interference in agency affairs, developing the factual record to make judicial

---

[4] The parties' briefing draws the standard for excusal from *Washington v. Barr*, 925 F.3d 109, 118–19 (2d Cir. 2019). Courts in this Circuit have cited both *Washington* and *Beharry* when examining whether exhaustion is excused for purposes of filing a § 2241 petition. *Compare Lallave*, 2022 WL 2338896, at *8 (citing *Beharry*); *with McPherson v. Lamont*, 457 F. Supp. 3d 67, 76 (D. Conn. 2020) (citing *Washington*). Because *Beharry* dealt specifically with a § 2241 petition, and *Washington* did not, the Court chooses to draw the relevant standard from *Beharry*. However, the Court looks to *Washington* and its progeny for additional guidance regarding exceptions to the judge-made exhaustion requirement. Moreover, the Court finds that Petitioner is excused from exhaustion based on futility, which is a basis for excusing exhaustion under the standards set forth in both *Washington*, 925 F.3d at 118, and *Beharry*, 329 F.3d at 62. Therefore, the decision to draw the excusal standard from *Beharry* rather than *Washington* makes no difference to the outcome of the Court's decision. Finally, because Petitioner cites the standard in *Washington*, 925 F.3d at 118–119, she argues that she will suffer "undue prejudice," rather than "irreparable harm." But, because the Court does not reach the second exception, Petitioner's framing of this exception is likewise irrelevant to the Court's decision.

review more efficient, and resolving issues to render judicial review unnecessary." *Beharry*, 329 F.3d at 62.  If a petitioner can show "that pursuing available administrative remedies would be futile," then "the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the [petitioner] from the requirement." *Id.* (alternation in original) (citation omitted).  Importantly, a petitioner's claim that her attempts to seek an administrative remedy likely would have failed is insufficient to show futility.  *Id.*; *see Ramraj v. Barr*, No. 6:19-CV-06723-MAT, 2020 WL 470615, at *4 (W.D.N.Y. Jan. 29, 2020) ("[E]ven if [the petitioner] believes that his arguments on administrative appeal are unlikely to persuade the BIA to reverse the IJ's custody determination, that is not enough to establish futility.").  However, excusal may be warranted where, for example, the BOP has already "exercised its discretion to deny [a petitioner] the relief [s]he seeks," *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 372 (E.D.N.Y. 2005), or where an attempt to pursue administrative remedies almost certainly "would have been an effort made in vain," *Napolitano v. Zenk*, No. 04-CV-5109 (NGG), 2005 WL 1263784, at *2 (E.D.N.Y. May 27, 2005).

Here, while Respondents argue that Petitioner must exhaust her administrative remedies, they have shown no receptivity to Petitioner's attempts to do so.  To begin, Respondents have expressly argued that Petitioner was not entitled to any process before her home confinement was revoked.  *See* ECF No. 12-1 at 1.  Notably, Petitioner's principal complaint pertains to the absence of such process.  *See* Pet. ¶ 1.  While Respondents' position in this litigation, standing alone, might not be enough to demonstrate futility, Petitioner further avers that her efforts to bring complaints regarding her reimprisonment to the BOP's attention were repeatedly hindered by BOP personnel. Cardoza Decl. ¶¶ 29–32; Pet. ¶¶ 50–51.

Respondents' argument that the BOP may have exercised its discretion to reconsider Petitioner's reimprisonment if she had asked it to do so, ECF No. 21 at 9, is unavailing.  Rather than demonstrating an openness to reconsidering its decision, Respondents argue in this litigation that Petitioner's positive marijuana test provided a nonarbitrary, rational reason for remanding Petitioner to prison.  ECF No. 12-1 at 12.  This position provides further support for the conclusion that "the purposes behind the requirement of exhaustion are no longer served" by requiring Petitioner to continue to seek an administrative remedy in this case.  *See Beharry*, 329 F.3d at 62.

In sum, although courts in this Circuit have set a high threshold for demonstrating futility, *see Lallave*, 2022 WL 2338896, at *9 (collecting cases), Respondents' position in this litigation, along with BOP staff's hindrance of Petitioner's appeal efforts, provide ample support for the conclusion that any further appeals to the BOP would be "an effort made in vain," *see Napolitano*, 2005 WL 1263784, at *2.  Indeed, the BOP General Counsel's most recent denial buttresses this point.  The Court therefore turns to a consideration of the merits of Respondents' motion to dismiss the petition.

### IV.    COUNT ONE:  PROCEDURAL DUE PROCESS

Turning to the substance of Petitioner's claims, the Court finds that Petitioner has failed to state a claim for violation of her procedural due process rights.  In particular, the Court finds that Petitioner has not plausibly alleged that she had a liberty interest in remaining in home confinement because she has not set forth allegations forming the basis of an implicit promise that she would remain on home confinement status if she behaved properly.  As a result, she has not plausibly alleged that the revocation of her home confinement triggered due process protections.  Accordingly, Count One of the petition is dismissed.

A. <u>Legal Standard</u>

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To state a due process claim under the Fifth Amendment, a petitioner must show that (1) state action (2) deprived her of life, liberty, or property (3) without due process of the law. *See Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015). If the petitioner has not been deprived of life, liberty, or property, then no process is due. *Kerry v. Din*, 576 U.S. 86, 90 (2015).

Not every change in a prisoner's conditions of confinement is sufficient to invoke due process protections. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976). Rather, "given a valid conviction, the criminal defendant has been constitutionally deprived of [her] liberty to the extent that the State may confine [her] and subject [her] to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Id.* For example, a prisoner does not have a general due process right to be housed in a particular institution, and the due process protections of the Fifth Amendment do not apply to transfers between institutions. *See id.* at 224–25. However, a change in prison conditions may trigger due process protections where the change "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that a prisoner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest").

With respect to an inmate's placement outside of a traditional prison setting, there is generally "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). The Supreme Court has, however, found that a convicted person has a

protected interest in retaining the liberties of parole and other conditional release programs that are sufficiently similar to parole.  *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Young v. Harper*, 520 U.S. 143, 152–53 (1997).

First, in *Morrissey*, the Supreme Court held that parolees have a protected interest in remaining on parole.  *Morrissey*, 408 U.S. at 482.  There, two prisoners filed habeas petitions after their parole was revoked without a hearing.  *Id.* at 472–73.  In assessing whether the parolees were entitled to any process before the revocation, the Supreme Court reasoned that "[w]hether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss."  *Id.* at 481.  To determine the nature of the parolees' interest in remaining on parole, the Court examined the history and features of parole.  *Id.* at 477–80; 481–82.  The Court explained that "[t]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."  *Id.* at 477.  The Court described that a parolee, "[s]ubject to the conditions of his parole, . . . can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life.  Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in prison."  *Id.* at 482.

To that end, the Supreme Court noted that a parolee "has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions."  *Id.* at 482; *see also id.* at 479 ("Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole.").  The Court found indication of an implicit promise that a parolee could remain at home absent a violation of her conditions even though the statute governing the parole program at issue

provided complete discretion to the warden to revoke parole at any time. *Id.* at 493 n.2 (Douglas, J., dissenting) (quoting Iowa Code § 247.9 (1971) as stating: "All paroled prisoners shall remain, while on parole, in the legal custody of the warden or superintendent and under the control of the chief parole officer, and shall be subject, at any time, to be taken into custody and returned to the institution from which they were paroled."). Ultimately, the Court held that the liberty of a parolee, "although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* Thus, "[i]ts termination call[ed] for some orderly process, however informal." *Id. Morrissey* then set forth the "minimum requirements of due process" in the parole revocation setting, including notice and disclosure of evidence, an opportunity to be heard and to present and cross-examine witnesses, a neutral and detached hearing body, and a written statement of the hearing body's decision. *Id.* at 489.

The Supreme Court later extended the principle set forth in *Morrissey* to a preparole conditional release program that had been instituted to reduce overcrowding in Oklahoma's state prisons. *Young*, 520 U.S. at 145. After spending five months outside prison in Oklahoma's preparole program, the habeas petitioner in *Young* was denied parole and returned to the state penitentiary. *Id.* at 146. In determining whether the petitioner had a protected interest in his continued liberty, the Supreme Court looked to its characterization of parole in *Morrissey*. *Id.* at 147–48. The Court then examined the features of the preparole program, including that a preparolee was able to keep his own residence, become employed, and "live[] a life generally free of the incidents of imprisonment." *Id.* at 148. The Court subsequently found that the preparole program "was a kind of parole" as parole was understood in *Morrissey*, *id.* at 152–53, and, as a result, a person in the program was entitled to the procedural protections set forth in *Morrissey*

before being removed from the program, *id.* at 145.  Citing *Morrissey*, *Young* discussed how the preparolee had an implicit promise that his liberty would continue so long as he complied with his conditions of release.  *Id.* at 150.  In so holding, the Court in *Young* did not find convincing the state's argument that preparole was different from parole because the preparolees remained within the custody of the Department of Corrections, as both types of offenders were required to pay regular visits to their parole officers and were subject to the Department's custody in the event of a violation of their conditions.  *Id.* at 149–50.[5]

When determining whether due process protections apply to a prisoner's conditional release, the Second Circuit has looked to whether the conditional release "is similar enough to parole as characterized by *Morrissey* and *Young* with respect to the extent and conditions of the liberty conferred" and to whether an inmate has a "reasonable expectation that he or she will maintain his or her status so long as he or she behaves properly."  *Holcomb v. Lykens*, 337 F.3d 217, 222–23 (2d Cir. 2003).  *See also Pugliese v. Nelson*, 617 F.2d 916, 922 (2d Cir. 1980) ("A protected liberty interest is created, for example, where the inmate currently enjoys or may reasonably expect to enjoy an important and substantial benefit upon his compliance with or the occurrence of certain conditions, which may be withdrawn only for good cause.").

In *Holcomb*, the Second Circuit examined whether an inmate who was in the custody of the Vermont Department of Corrections, but who was released on a temporary furlough, was entitled to due process protections before being remanded to custody following a violation of furlough conditions.  337 F.3d at 218–22.  The statute that authorized temporary furlough

---

[5] *Young* also discussed Oklahoma's Governor's discretionary ability to deny parole to a person in the preparole program.  *Id.* at 150–51.  Finding that the individual in that case had not been put on notice that the Governor's decision to deny parole would result in reincarceration, the Supreme Court did not speak definitively about whether the fact that reincarceration was dependent on "extrinsic events," such as the Governor's actions, would affect the finding of a liberty interest.  *Id.* at 151–52.

specifically noted that it was not to be "interpreted as a probation or parole of the inmate," but rather was "a permitted extension of the limits of the place of confinement for inmates committed to the custody" of the Department. *Id.* at 222. The Second Circuit rejected the argument that the statute's characterization of the furlough as not equivalent to probation or parole should carry the day; rather, the court noted that the proper inquiry focused on the *conditions* of the furlough, to determine if they were similar to the conditions of the programs at issue in *Morrissey* and *Young*, and on whether there was an implicit promise creating the "reasonable expectation" that the furloughee would "maintain his or her status so long as he or she behave[d] properly." *Id.* at 222–23. Ultimately, the Second Circuit did not reach the question of whether the particular Vermont program conferred a liberty interest on the furloughee, noting that a factual question remained as to whether the Department could decline to renew the furloughee's extended furlough entirely at its discretion. *Id.* at 223 ("If extended furlough must be renewed every fifteen days absent a finding of improper behavior, there is a good argument to be made that the furloughee has a reasonable expectation that he or she will maintain his or her status so long as he or she behaves properly. If, on the other hand, DOC may decline to renew extended furlough entirely at its discretion, the argument that the furloughee has such an expectation is severely, perhaps fatally, weakened."). Instead, the court held that, even if the furloughee had a federally protected liberty interest, the furloughee had been provided with the procedural protections required by *Morrissey*, such as written notice of the violation and a revocation hearing before a neutral and detached hearing officer. *Id.* at 224–25.

The Second Circuit has also analyzed on three occasions whether the conditions of New York's temporary work release program were similar to the parole and preparole programs at issue in *Morrissey* and *Young*, holding in all instances that the features of the New York program entitled

the inmates to due process before revocation. For instance, in *Kim v. Hurston*, 182 F.3d 113, 115, 118 (2d Cir. 1999), the court held that the plaintiff enjoyed a liberty interest in a temporary work release program that was "virtually indistinguishable from either traditional parole or the Oklahoma program considered in *Young*," in that the petitioner lived at home and worked a job, while regularly reporting to a day reporting center program at her correctional facility. *See also Tracy v. Salamack*, 572 F.2d 393, 395–96 (2d Cir. 1978) (per curiam) (requiring due process before inmates' participation in temporary release program could be revoked); *Recore*, 317 F.3d at 200 (in context of temporary work release program, interpreting *Morrissey* as establishing that "once the State has given an inmate the freedom to live outside an institution, it cannot take that right away without according the inmate procedural due process").[6]

## B.  Discussion

Petitioner contends that she had a liberty interest in remaining on home confinement and, thus, she had a constitutional right not to be remanded to prison without procedural due process.

---

[6] Other circuits have also held that an inmate serving a sentence at home has a liberty interest when remanded to custody. *See, e.g.*, *Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 439 (6th Cir. 2013) ("A transfer from home confinement to prison confinement, it seems to us, amounts to a sufficiently severe change in conditions to implicate due process. . . . A prison cot is not the same as a bed, a cell not the same as a home, from every vantage point: privacy, companionship, comfort. And the privileges available in each are worlds apart . . . ."); *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 890 (1st Cir. 2010) (holding that inmates had a protectable liberty interest because the electronic surveillance program at issue, "unlike institutional confinement of any kind, allowed the appellees to live with their loved ones, form relationships with neighbors, lay down roots in their community, and reside in a dwelling of their own choosing (albeit subject to certain limitations) rather than in a cell designated by the government"); *Paige v. Hudson*, 341 F.3d 642, 643–44 (7th Cir. 2003) (holding that being removed from a home detention program into jail is a "sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty under the *Sandin* doctrine"); *see also Asquith v. Dept. of Corr.*, 186 F.3d 407, 411 (3d Cir. 1999) (distinguishing placement in halfway house, which "amount[ed] to institutional confinement," from ability to live at home). However, one appellate case, *Domka v. Portage County, Wisconsin*, 523 F.3d 776, 780–82 (7th Cir. 2008), suggested that the liberty interest of an inmate who was serving, by agreement, a portion of his sentence in a home detention program might be lessened by the fact that the inmate "was not a probationer but instead a prisoner serving his time outside the jail." In *Domka*, the inmate was informed that a violation of his conditions would cause his "removal from the program without notice or avenue of appeal." *Id.* at 779. Therefore, the Seventh Circuit held that, even if the inmate had a constitutional liberty interest, he had waived any due process protections that might attach. *Id.* at 780–82. More recently, the Eleventh Circuit affirmed a district court's dismissal of a habeas petition filed by an inmate who the BOP had released to home confinement under the CARES Act and later remanded to prison. *Touizer v. U.S. Att'y Gen.*, No. 21-10761, 2021 WL 3829618, at *2 (11th Cir. Aug. 27, 2021) (per curiam). The petitioner had requested an order that the BOP release him to home confinement, which the district court properly determined it did not have the authority to grant. *Id.*

There appears to be no dispute that Petitioner was afforded no process relating to her reincarceration. Therefore, the survival of Petitioner's procedural due process claim turns on whether, taking the factual allegations in her petition as true, Petitioner had a cognizable liberty interest in remaining on home confinement.

As a preliminary matter, the parties disagree on which line of cases should control the Court's due process inquiry. Respondents argue that *Meachum*, a case regarding an inmate's transfer between prison facilities, and *Sandin*, a case regarding an inmate's placement in segregated confinement, provide the legal framework the Court must apply. *See also Huang v. Johnson*, 251 F.3d 65, 71–72 (2d Cir. 2001) (applying *Meachum* to analyze "restrictive" juvenile day placement program). By contrast, Petitioner argues that the Court should look to *Morrissey* and *Young* to determine whether the petition plausibly alleges that her home confinement was similar enough to parole to create a liberty interest.

In the Court's view, the *Morrissey* and *Young* line of cases should govern the outcome here. This case poses a different question than the questions posed in *Meachum* and *Sandin* because Petitioner was returned to a federal facility from home confinement; she was not merely transferred between federal facilities, as in *Meachum*, or placed in segregated confinement within a prison facility, as in *Sandin*. *See Recore*, 317 F.3d at 200, 202 (finding that *Sandin*'s citations to *Morrissey* and *Wolff v. McDonnell*, 418 U.S. 539 (1974), "negate any suggestion that *Sandin*'s particularized test should be applied outside the intra-prison disciplinary context," and noting the inappropriateness of "comparing the apples of revoking a work release program with the oranges of an intra-prison disciplinary transfer"). As *Holcomb* recognized, the label attached to Petitioner's status—"prerelease custody," *see* 18 U.S.C. § 3624(c)—is not determinative. *See Holcomb*, 337 F.3d at 222 ("[t]hat Vermont's furlough statute expressly denies equivalence between furlough

and parole is of little assistance in our inquiry").  The fact that the BOP considers Petitioner's placement in home confinement simply as a difference in her *place* of confinement is likewise not determinative.  *See id.* (noting that Vermont statute characterized furlough as a "permitted extension of the limits of the place of confinement").  Rather, because Petitioner's home confinement allowed her to live outside the walls of a prison facility, the Court finds that this case is more comparable to the line of cases that apply *Morrissey* and *Young*.  Thus, although it must take into account the holdings of *Meachum* and *Sandin*, the Court will focus primarily on how Petitioner's home confinement compared to parole and other similar programs, as discussed in *Morrissey*, *Young*, and their progeny.

Applying the *Morrissey* and *Young* line of cases, the Court holds that a petition asserting that the BOP violated an inmate's procedural due process rights when revoking her home confinement status must plausibly allege both:  (1) that the extent and conditions of the liberty conferred to the inmate when she was placed in home confinement are sufficiently similar to parole and similar programs to trigger due process protections; and (2) that there was an implicit promise providing the inmate with the reasonable expectation that she would remain on home confinement status so long as she behaved properly.  *See Morrissey*, 408 U.S. at 481–82; *Young*, 520 U.S. at 145, 147–48; *Holcomb*, 337 F.3d at 221–22.  While Petitioner here has plausibly alleged that she suffered a severe deprivation of liberty when her home confinement was revoked, the petition is devoid of any allegations suggesting that Petitioner was implicitly promised that she would remain on home confinement unless she committed a disciplinary infraction.  Accordingly, given the constraints of current precedent, the petition does not presently provide a basis for the Court to extend the rationale of *Morrissey* and *Young* to Petitioner's transfer to home confinement under the CARES Act.

In applying *Morrissey* and *Young* to Petitioner's allegations, the Court first examines the context in which Petitioner was placed on home confinement.  As alleged in the petition, the BOP placed Petitioner on home confinement by virtue of its authority under 18 U.S.C. § 3624(c)(2) and the CARES Act.  Section 3624(c)(2) provides the BOP with the authority "to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  Due to the dangers posed by the COVID-19 pandemic, Congress passed the CARES Act, which permitted the BOP to lengthen the amount of time an inmate can be placed in home confinement under § 3624(c)(2).  *See* CARES Act § 12003(b)(2) (providing that, if certain criteria are met, the Director of the BOP "may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)").  Petitioner alleges that she was transferred to home confinement under the CARES Act due to her low public safety risk and the dangers of the pandemic.  Pet. ¶ 14.  The context of this transfer presents relatively new terrain for federal courts.  Consequently, there is no controlling authority that answers the precise question of whether placement in home confinement pursuant to the CARES Act creates a liberty interest that triggers due process protections, though another court in this District recently held that another federal inmate was entitled to such protections.  *See Tompkins v. Pullen*, No. 3:22-cv-339-OAW, ECF No. 36.

The Court is likewise unaware of any controlling authority answering the related question of whether an inmate serving a portion of her sentence at home pursuant to § 3624(c)(2) has a liberty interest in remaining in home confinement.  To be clear, such authority would not answer the precise question at issue in this case because Petitioner alleges that she was placed in home confinement pursuant to the CARES Act, not merely pursuant to § 3624(c)(2).  Still, given that the CARES Act expanded the BOP's authority under § 3624(c)(2), case law discussing whether

placement in home confinement pursuant to § 3624(c)(2) creates a liberty interest would be instructive.  In any event, the parties have not cited any Second Circuit or Supreme Court authority bearing directly on this issue, and the Court is aware of none.

Absent controlling authority on the relevant question, the Court must undertake original analysis of the specific circumstances of Petitioner's home confinement.  The Court first finds that Petitioner has plausibly alleged that, when her home confinement was revoked, she suffered a "grievous loss" of freedom.  *Morrissey*, 408 U.S. at 481.[7]  Petitioner alleges that she was remanded from home confinement, where she lived with her fiancé, children, and stepchildren, to a federal prison.  Petitioner further alleges that, while living at home, she cared for her family, was permitted to work, and was able to form certain attachments common to normal life.  Taken as true, these allegations indicate that, while on home confinement, Petitioner's life was "very different from that of confinement in a prison."  *See Young*, 520 U.S. at 147 (quoting *Morrissey*, 408 U.S. at 482); *see also Gonzalez-Fuentes*, 607 F.3d at 890.  The Court finds that Petitioner has plausibly alleged that she suffered a substantial deprivation of liberty when her home confinement was revoked, which could warrant due process protections.

In order for Petitioner's procedural due process claim to survive, however, *Morrissey*, *Young*, and their progeny require some indication of an implicit promise that Petitioner would remain on home confinement absent a disciplinary violation.  Specifically, in *Morrissey*, the Court noted that "[i]mplicit in the [state parole] system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of

---

[7] To the extent the "grievous loss" test set forth in *Morrissey* was stripped of some force by *Meachum* and *Sandin*, *see Meachum*, 427 U.S. at 224 ("[w]e reject at the outset the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause" (emphasis in original)), the Court refers to its earlier holding that *Meachum* and *Sandin* do not squarely govern a case involving an inmate who was allowed to reside outside of a prison.  In any event, the Court's decision here is not inconsistent with *Meachum*'s statement regarding "grievous loss" because the Court holds that Petitioner's grievous loss, alone, does not trigger due process protections.

his parole." 408 U.S. at 479.  The Court subsequently indicated that a parolee "has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* at 482.  In *Young*, 520 U.S. at 150, the Court again emphasized this "implicit promise" language, and the Second Circuit has continued to emphasize it in applying the *Morrissey* and *Young* line of cases.  *See Holcomb*, 337 F.3d at 223; *Pugliese*, 617 F.2d at 922.

The *Morrissey* line of cases does not specify where such an implicit promise must originate. It could derive from the notice given to the individual before she is placed on home confinement, *see Ortega*, 737 F.3d at 439 ("What process is due . . . may well turn on the notice given to the individual before he was allowed to serve a prison sentence at home."), or from an analysis of the statutory or regulatory framework governing the home confinement regime, *see Holcomb*, 337 F.3d at 223 (examining the Vermont statute and Vermont Department of Corrections regulations governing when extended furlough could be renewed).  In *Morrissey*, the Court looked more generally to the "essence" of parole, *id.* at 477, and the parole system's "concern with parole violations," *id.* at 479, to find evidence of the implicit promise.  There are therefore several possible sources for the promise, and the Court cannot hold—as Respondents have proposed—that an implicit promise of continued liberty *must* be communicated expressly via a statute or regulation. Imposing such a requirement would be more akin to requiring an explicit promise, as opposed to an implicit one.

Whatever the source, though, *Morrissey* and its progeny require the presence of an implicit promise, and there is nothing in Petitioner's allegations regarding her home confinement that suffices, at present.  In her petition and the documents attached thereto,[8] Petitioner does not point to statements by or from any source, or to anything inherent in the system of placing inmates in

---

[8] The documents Petitioner submitted after her petition was filed are discussed in further detail below.

home confinement under the CARES Act, that would suggest the presence of an implicit promise

that Petitioner would remain on home confinement absent a disciplinary violation.  Simply put,

Petitioner makes no allegation that it was ever represented to her—even by implication—at the

time she was transferred to home confinement or thereafter that her home confinement could be

"withdrawn only for good cause."  *See Pugliese*, 617 F.2d at 922; *see also Ortega*, 737 F.3d at

439.[9]

      When pressed at oral argument regarding how Petitioner was implicitly promised that she

would remain on home confinement absent a disciplinary violation, Petitioner's counsel pointed

to:  (1) 28 U.S.C. § 3624(g)(5), which discusses sanctions available to the BOP when a prisoner

violates the conditions of her prerelease custody; (2) a December 10, 2021, memorandum of BOP

General Counsel Ken Hyle ("Hyle Memorandum"), which discusses the BOP's position that not

all inmates serving home confinement under the CARES Act should be returned to a correctional

facility after the pandemic's national emergency period has ended; and (3) Petitioner's family

circumstances.    Petitioner  subsequently  submitted  as  "additional  authority"  the  Hyle

Memorandum,  the  BOP's  Program  Statement  on  Home  Confinement,  and  testimony  from

Respondent Carvajal and BOP Medical Director Jeffrey Allen, given before the Senate Judiciary

Committee on June 2, 2020, for the Court's review.  ECF No. 22.  In assessing these items, the

Court first notes that it is unclear how Petitioner's family circumstances could independently form

the basis of an implicit promise that she would remain on home confinement.  Additionally, for

---

[9] In connection with Petitioner's opposition to Respondents' motion to dismiss, Petitioner submitted a document entitled  "Resident  Fact  Sheet  (Resident  Copy)"  bearing  the  headers  of  GEO  Reentry  Services  and  the  Bronx Community Reentry Center.  ECF No. 15-3.  Petitioner does not allege that she was provided with this document, or any other document setting forth the rules of her home confinement, when she was transferred to that status.  Instead, her counsel simply attests that it is a "Resident Fact Sheet by the GEO Group's Bronx Community Reentry Center." ECF No. 15-2 ¶ 4.  Even if the Court could consider this document in ruling on a motion to dismiss, which it cannot, the relevance of the document to Petitioner's claims as alleged in the petition is minimal, given that Petitioner has not explained whether and/or how it was provided to her or how it may have formed the basis of the implicit promise required by *Morrissey* and its progeny.

the reasons below, none of the sources Petitioner references can save her procedural due process claim.

To start, the Court is unpersuaded by Petitioner's contention that an implicit promise of continued liberty can be found in § 3624(g)(5).  Section 3624(g)(5) provides that, if a prisoner violates a condition of her prerelease custody, the Director of the BOP may impose additional conditions on the prisoner, and that "[i]f the violation is nontechnical in nature," the Director "shall revoke the prisoner's prerelease custody."  Petitioner contends that this provision implicitly promises that, absent such a violation of conditions, the BOP will not revoke an inmate's home confinement.  Respondents argue that § 3624(g)(5) is a product of the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), and as a result, it is inapplicable to inmates transferred to home confinement under the CARES Act.  The Court need not reach Respondents' argument because it finds that § 3624(g)(5) does not contain an implicit promise of continued liberty.  Petitioner essentially asks the Court to conclude that, because § 3624(g)(5) sets forth revocation as a sanction for certain violations, no revocation shall occur absent such a violation.  But this approach is inconsistent with Supreme Court precedent analyzing due process protections in the prison context. *See Sandin*, 515 U.S. at 483 ("[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause.").  Thus, even assuming § 3624(g)(5) was applicable to Petitioner's period of home confinement, the Court is unable to draw from it the negative implication that revocation will only occur in the event of a violation.[10]

---

[10] The Court acknowledges that *Morrissey* discusses how "[i]mplicit in the system's *concern with parole violations* is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole."  408 U.S. at 479 (emphasis added).  At this stage, the Court takes no position on whether the application of § 3624(g)(5), alongside other potential characteristics of Petitioner's home confinement under the CARES Act, could serve as a basis for concluding that the "essence" of such home confinement includes a "concern with . . . violations" sufficient to establish an implicit promise of continued liberty.  The Court merely holds that § 3624(g)(5), standing alone, does not suffice to provide an implicit promise of continued liberty.

Moreover, at this stage, the Court is unable to consider the three documents Petitioner submitted as "additional authority," *see* ECF No. 22.  As noted, in reviewing a motion to dismiss a habeas petition, the Court must apply the same principles that it applies to a motion to dismiss a civil complaint under Rule 12(b)(6).  *Dimartino*, 2022 WL 124308, at *2; *Stinson*, 2017 WL 2126592, at *1 n.1.  Thus, the petition is deemed to include any written instrument attached to it as an exhibit, any statements or documents incorporated in it by reference, or any documents considered integral to it.  *See Chambers*, 282 F.3d at 152.  None of the three sources Petitioner provides as additional authority were attached to her petition or incorporated into it by reference.  Nor are they properly considered integral to the petition, having been submitted only after oral argument.  Although Respondents do not object to the Court considering these documents, *see* ECF No. 29, it would be improper for the Court to do so at the motion to dismiss juncture, without converting the motion to dismiss into a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d); *Francis v. Comm'r of Corr.*, No. 3:18-cv-847 (SRU), 2021 WL 3773302, at *2 (D. Conn. Aug. 25, 2021) (discussing conversion of motion to dismiss habeas petition into motion for summary judgment).  The Court is not inclined to convert the present motion into one for summary judgment on the current record, which is not fully developed.  Accordingly, at this stage, Petitioner's additional authority cannot remedy the absence from the petition of any allegations suggesting that Petitioner relied on an implicit promise that she would remain on home confinement unless she committed a disciplinary violation.

Finally, Petitioner's request that the Court focus exclusively on the *features* of her home confinement, ECF No. 15 at 8, does not save her procedural due process claim.  Petitioner asserts that the features of her home confinement mirrored the features of parole, preparole, and work release in many respects, including that she was able to form close family and community ties and

obtain employment.  *See id.*  In making this argument, Petitioner asks the Court to relegate its "implicit promise" inquiry to a secondary consideration, and she contends that an implicit promise is only relevant to the extent it helps to demonstrate the grievousness of an inmate's loss of liberty. But, as noted, *Morrissey*, *Young*, and their progeny instruct the Court to examine both the features of Petitioner's home confinement *and* whether Petitioner was implicitly promised that she would remain on home confinement absent a disciplinary infraction.  Petitioner correctly points out that, in *Kim*, 182 F.3d 113, the Second Circuit did not discuss *Morrissey*'s implicit promise language. However, the Court is unconvinced that, in *Kim*, the Second Circuit meant to convey that an implicit promise is unnecessary for a finding of a liberty interest in this context.[11]  Instead, the Court interprets *Kim* as presuming that the implicit promise requirement of *Morrissey* was met because the work release program at issue in *Kim* was "virtually indistinguishable" from the programs at issue in *Morrissey* and *Young*.  *Id.* at 118.  Here, while some of the features Petitioner cites may be common to both home confinement and parole, the allegations of the petition do not provide a sufficient basis for the Court to conclude that Petitioner's home confinement was "virtually indistinguishable from either traditional parole or the Oklahoma program considered in *Young*," *id.* at 118, such that the implicit promise requirement of *Morrissey* may be presumed to be met.

In sum, unlike courts that have found a liberty interest in parole and other established preparole and conditional release programs, the Court is unable to draw from precedent—or from the features inherent to the practice of placing federal inmates in home confinement—that an implicit promise of continued liberty absent violation exists in the context of Petitioner's case. This is not to say that such an implicit promise does not exist.  But, to the extent a specific statement

---

[11] Indeed, the Second Circuit has routinely discussed *Morrissey*'s implicit promise language, including in *Holcomb*, 337 F.3d at 223, which was decided after *Kim*.

or source—or more generally, the essence of home confinement under the CARES Act—does include an indication of an implicit promise of continued liberty absent a violation of conditions, there is no sign of it in the petition.

For the foregoing reasons, the Court is constrained by *Morrissey*, *Young*, and their progeny to find that Petitioner has not plausibly alleged that she had a liberty interest in remaining on home confinement and, therefore, that no process was due to Petitioner when the BOP revoked her home confinement. Her procedural due process claim is dismissed.

## V.    COUNT TWO: SUBSTANTIVE DUE PROCESS

Because Petitioner has failed to plausibly allege a liberty interest in remaining in home confinement, her substantive due process claim must be dismissed for the reasons discussed above. To present a substantive due process claim, Petitioner must establish (1) that she possessed a liberty interest and (2) that Respondents "infringed that [liberty] interest in an arbitrary or irrational manner." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). In contrast to procedural due process claims, which concern "the adequacy of the procedures provided by the governmental body for the protection of liberty or property rights of an individual," substantive due process claims concern "limitations on governmental conduct toward an individual regardless of the procedural protections." *Gordon v. Nicoletti*, 84 F. Supp. 2d 304, 308 (D. Conn. 2000). However, to establish a violation of either substantive or procedural due process, Petitioner must initially show that she was deprived of a liberty interest. *See id.* at 308–09. Accordingly,

Petitioner's substantive due process claim fails for the same reasons her procedural due process claim fails.[12]  Count Two is dismissed.

## VI.    COUNT THREE:  EIGHTH AMENDMENT

Moreover, Petitioner has failed to state a claim for a violation of the Eighth Amendment. Petitioner does not directly address Count Three in her briefing, which suggests that she may be abandoning this claim.  However, to the extent Petitioner seeks to continue to pursue it, Count Three is dismissed because Petitioner fails to allege conduct amounting to an Eighth Amendment violation.

The Eighth Amendment prohibits "cruel and unusual punishment[]."  Inmates typically bring Eighth Amendment claims under three basic theories:  (1) denial of adequate medical care; (2) unconstitutional conditions of confinement unrelated to medical care; and (3) failure to protect. *See Randle v. Alexander*, 960 F. Supp. 2d 457, 470 (S.D.N.Y. 2013).  To state an Eighth Amendment claim, a prisoner must allege both subjective and objective elements.  *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015).  First, the prisoner must allege that the respondents "acted with a subjectively 'sufficiently culpable state of mind.'"  *Id.*  Second, she must allege "that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions."  *Id.*  Analysis of this objective prong is "context specific" and "depends on the claim at issue."  *Id.*  The Eighth Amendment is offended by conduct that is "repugnant to the conscience of mankind."  *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992)).

---

[12] In so finding, the Court does not address whether, in all instances, the lack of a liberty interest for purposes of a procedural due process claim equates to the lack of a liberty interest for purposes of a substantive due process claim, and vice versa.  *See Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 843 (1977) ("Of course, recognition of a liberty interest in foster families for purposes of the procedural protections of the Due Process Clause would not necessarily require that foster families be treated as fully equivalent to biological families for purposes of substantive due process review.").  Petitioner does not contend that the Court should assess whether she has a liberty interest with respect to her procedural due process claim any differently than it assesses whether she has a liberty interest with respect to her substantive due process claim.  Accordingly, the Court assumes that the potential liberty interests at issue are the same for both claims.

Here, Petitioner has failed to allege any conduct that is harmful enough or sufficiently serious to constitute an Eighth Amendment violation.  Petitioner asserts that her reimprisonment for a single positive test for marijuana is excessive and grossly disproportionate punishment, and that it serves no legitimate penological purpose.  Pet. ¶¶ 61–62.  Because Petitioner has not briefed this claim, she provides no examples of cases holding that such conduct constitutes an Eighth Amendment violation.   To the contrary, it seems that sanctioning drug use, including by redesignating an inmate to a different, more restrictive setting, does not constitute conduct that is "repugnant to the conscience of mankind," *see Hudson*, 503 U.S. at 9–10.   Count Three is dismissed.

## VII.    COUNT FOUR: *ACCARDI*

The Court further finds that Petitioner has failed to state a claim under the *Accardi* doctrine. Pursuant to the *Accardi* doctrine, an agency's failure to follow its own procedures or regulations can require its action to be invalidated.  *See United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) (vacating deportation order where Attorney General did "precisely what the regulations forbid him to do"); *Kohn v. Barr*, 813 F. App'x 623, 626 (2d Cir. 2020) (summary order).  The *Accardi* doctrine "is premised on fundamental notions of fair play underlying the concept of due process."  *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991).  "The crucial question is whether the alleged conduct of the [agency] deprived [the] petitioner of any of the rights guaranteed [her] by the statute or by the regulations issued pursuant thereto."  *Accardi*, 347 U.S. at 265.

In this case, Petitioner has failed to articulate how the BOP deprived her of any rights guaranteed to her by a binding regulation.  Petitioner posits that the BOP was required to follow the "Inmate Discipline Program," set forth in 28 C.F.R. § 541.1 *et seq.*, when it revoked her home

confinement for a disciplinary reason.  *See* Pet. ¶¶ 66–68.  Although Petitioner correctly points out that the sanctions available under the Inmate Discipline Program include changes in housing and removal from programs, *see* 28 C.F.R. § 541.3, the Court is not convinced that the BOP must comply with the Inmate Discipline Program whenever it effects a redesignation that appears to be precipitated, at least in part, by a disciplinary infraction.  To the contrary, the BOP has broad authority to redesignate a prisoner pursuant to 18 U.S.C. § 3621(b), which provides that "[t]he [BOP] shall designate the place of the prisoner's imprisonment" and that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."  *See Levine v. Apker*, 455 F.3d 71, 83 (2d Cir. 2006) ("The BOP is the sole agency charged with discretion to place a convicted defendant within a particular treatment program or a particular facility.").  The BOP may consider several factors under § 3621(b) that could relate to the imposition of discipline, such as the inmate's "history and characteristics," "security designation," and "programmatic needs."  Petitioner offers no support for the proposition that each time a disciplinary infraction is taken into account in relation to a § 3621(b) redesignation, the BOP must proceed under the Inmate Discipline Program.  Accordingly, the Court cannot conclude that, because Petitioner's redesignation appears to have been related to her disciplinary infraction, the BOP was required to follow the procedures set forth in 28 C.F.R. § 541.1 *et seq.* when it redesignated her to a prison facility.

In making this finding, the Court does not mean to imply that the BOP's authority to redesignate inmates is completely unfettered.  For example, courts in this Circuit have recognized a judicial role in reviewing redesignations to ensure that the BOP has considered the criteria set forth in § 3621(b).  *See Pasonick v. Strada*, No. 12-CV-6204 SLT, 2013 WL 431332, at *3 (E.D.N.Y. Feb. 4, 2013) ("[S]o long as it considers the factors enumerated in § 3621, the BOP's

discretion in making prisoner classifications is virtually unfettered."); *Schick v. Lara*, No. 11 CIV. 1175 DLC HBP, 2012 WL 753755, at *1 (S.D.N.Y. Mar. 8, 2012) ("If the BOP has considered the appropriate factors in reaching its placement decision, a court cannot reconsider the BOP's placement decision."). However, the Court need not determine whether the BOP failed to examine the criteria set forth in § 3621(b) because Petitioner has not asserted such a claim.

Nor is the Court's holding based on a more general finding that redesignation decisions are wholly beyond the reach of the *Accardi* doctrine. Courts outside of this Circuit have suggested that the *Accardi* doctrine may apply where, for instance, the BOP implements binding redesignation regulations and then fails to follow them. *See Mazzara v. Entzel*, No. 5:18CV117, 2019 WL 3366111, at *5 (N.D.W. Va. June 26, 2019), *report and recommendation adopted*, No. 5:18CV117, 2019 WL 3358394 (N.D.W. Va. July 25, 2019) (suggesting that custody classification that caused prisoner to be housed in higher security facility might be challengeable under *Accardi*). The Court's holding is based on the narrower conclusion that Petitioner's redesignation did not need to be carried out through the process set forth in 28 C.F.R. § 541.1 *et seq.*, and as a result, Petitioner has failed to plausibly allege that she was deprived of any rights guaranteed under those regulations. *See Saleh v. Young*, No. 5:19-CV-00468, 2021 WL 1758711, at *2 (S.D.W. Va. May 4, 2021) (entertaining *Accardi* challenge to prison transfer but finding that BOP program statement did not include mandatory language that limited BOP discretion).

For these reasons, Petitioner has failed to state a claim under the *Accardi* doctrine. Count Four is dismissed.

## VIII.   COUNT FIVE:  REHABILITATION ACT

The Court next finds that Petitioner has failed to state a claim under the Rehabilitation Act.[13]  The Rehabilitation Act provides, in part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).  In order to establish a *prima facie* case under the Rehabilitation Act, Petitioner must show that (1) she is a qualified individual with a disability; (2) the BOP is an entity subject to the Act; and (3) she was denied the opportunity to participate in or benefit from the BOP's services, programs, or activities or the BOP otherwise discriminated against her by reason of her disability.  *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

Petitioner has failed to plausibly allege that the BOP denied her the opportunity to participate in or benefit from its home confinement program, or otherwise discriminated against her, due to her disabilities.  Petitioner alleges in a conclusory fashion that she "suffers from qualifying disabilities," that "[n]o BOP official has provided [her] any accommodations that would allow her to meaningfully participate in the home confinement program given her disabilities," Pet. ¶¶ 35, 72, and that "[t]he BOP's actions in this case are denying [her] equal and effective access to [the] BOP's programs and services, including its home confinement program, on the basis of disability," *id.* ¶ 74.  These allegations are conclusory and appear to be legal conclusions unsupported by factual allegations.  *See Iqbal*, 556 U.S. at 678.  Moreover, these allegations are

---

[13] The Court acknowledges Respondents' argument that the Rehabilitation Act imposes specific exhaustion requirements beyond those imposed on § 2241 petitioners.  However, because it finds that Count Five fails to state a claim, the Court need not address the nature of those exhaustion requirements or whether Petitioner has exhausted her administrative remedies under the Rehabilitation Act in this case.

contradicted by Petitioner's other allegations that she was reimprisoned due to her positive marijuana test. *See id.* ¶ 28 (alleging that Respondent McFarland told RRC staff that Petitioner would be reimprisoned "after learning that RRC staff intended to meet with [her] to initiate a discipline process for an alleged positive marijuana test"). To the extent Petitioner claims to be alleging that she was denied the opportunity to participate in the home confinement *revocation* process due to her disability, ECF No. 15 at 24, Petitioner fails to specify in her petition how this is so. Simply put, the petition is devoid of any factual allegations supporting Petitioner's claim that Respondents reimprisoned her or denied her the opportunity to participate in or benefit from home confinement solely due to her disability. Because Petitioner's threadbare allegations will not suffice, Count Five must be dismissed. *See Iqbal*, 556 U.S. at 678.

## IX.    COUNT SIX:  DECLARATORY JUDGMENT

Because the Court has extinguished each of the claims underlying Petitioner's declaratory judgment count, Count Six is likewise dismissed. *See In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir. 1998) ("A declaratory judgment action presents an actual controversy if 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'").

## X.    CONCLUSION

For the reasons described herein, Respondents' motion to dismiss is GRANTED, and the petition is DISMISSED without prejudice to refiling. If Petitioner intends to file an amended petition, she must do so within 30 days of this Ruling and Order. In light of the dismissal of her petition, Petitioner's request for provisional enlargement to home confinement pending the resolution of her petition is DENIED as moot.

**SO ORDERED** at Hartford, Connecticut, this 9th day of August, 2022.

        */s/ Sarala V. Nagala*
        SARALA V. NAGALA
        UNITED STATES DISTRICT JUDGE