## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**EVA CARDOZA**,

*Petitioner-Plaintiff*,

v.

**TIMETHEA PULLEN**, Warden of Federal
Correctional Institution Danbury, in her official
capacity,

**PATRICK MCFARLAND**, Residential
Reentry Manager, in his official capacity, and

**COLETTE S. PETERS**, Director, Federal
Bureau of Prisons, in her official capacity,

*Respondents-Defendants.*

Civil Action No. 22-591

**PETITION FOR WRIT OF
HABEAS CORPUS
PURSUANT TO 28 U.S.C. §
2241, REQUEST FOR
ORDER OF IMMEDIATE
ENLARGEMENT IN
ADVANCE OF MAY 6, 2022
& COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

August 16, 2022

## PRELIMINARY STATEMENT

1.　　Petitioner-Plaintiff Eva Cardoza is a 45-year-old mother who spent more than a year on home confinement caring for her young daughter and stepchildren, providing crucial support to her seriously ill fiancé, and helping her diabetic mother. Despite her close family ties and connections to the community, the Federal Bureau of Prisons ("BOP"), through Respondents-Defendants, imprisoned Ms. Cardoza without providing her with a fair hearing in front of a neutral decisionmaker to justify her separation from her family and established community ties.

2.　　Respondents-Defendants' imprisonment of Ms. Cardoza violates her due process rights. Respondents-Defendants did not inform Ms. Cardoza that she faced re-imprisonment, denied her the assistance of counsel, failed to disclose to her the evidence underlying her charge, and denied her the opportunity to present evidence and confront witnesses at a hearing before a

neutral and detached decisionmaker before they proceeded to separate her from her family and incarcerate her.

3.      Ms. Cardoza petitions this Court for a Writ of Habeas Corpus to remedy her unlawful imprisonment and seeks an order of enlargement pending a decision on the underlying petition. She also seeks declaratory and injunctive relief.

**PARTIES**

4.      Petitioner-Plaintiff Eva Cardoza is a 45-year-old mother who, until being re-imprisoned by BOP, had been the primary caregiver for her daughter and stepchildren, and was also caring for her fiancé (who suffers from multiple health issues) and her mother (who has diabetes). Ms. Cardoza is currently imprisoned at the Federal Correctional Institution Danbury ("FCI Danbury") and is in custody of the BOP.

5.      Respondent-Defendant Timethea Pullen is the Warden at FCI Danbury. She is the immediate custodian of Ms. Cardoza. She is sued in her official capacity.

6.      Respondent-Defendant Patrick McFarland is a Regional Reentry Manager at the BOP's New York Residential Reentry Management (RRM) field office. On information and belief, he is the BOP official who determines if individuals supervised by the New York RRM will be returned to prison for violations while on home confinement and notifies the U.S. Marshals to detain individuals and remand them to prison. He is sued in his official capacity.

7.      Respondent-Defendant Colette S. Peters is the Director of the BOP. She has ultimate authority over the decision to confine Ms. Cardoza and the conditions and location of her confinement. She is sued in his official capacity.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to Article I, § 9, cl. 2 of the U.S.

Constitution; the Fifth and Eighth Amendments of the U.S. Constitution; 28 U.S.C. §§ 1331,

1346, 1651, 2201-2202, and 2241.

9.      Venue is proper in the District of Connecticut because Petitioner-Plaintiff is

physically present in the District of Connecticut and in the custody of the Respondents-

Defendants in this district. 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

**The Home Confinement Program**

10.     Ms. Cardoza was on home confinement from May 2020 until June 2021.

11.     Home confinement is a program of the BOP whereby individuals serving a federal

sentence are released from prison earlier than the expiration of their imposed sentences of

imprisonment. *See* 18 U.S.C. § 3624(c)(2). Individuals on home confinement remain technically

in BOP custody but are allowed to live at home with their families, seek and maintain

employment, pursue educational opportunities, participate in treatment programs, attend religious

services, and engage in various other activities in their communities. Home confinement is

intended to "afford [a] prisoner a reasonable opportunity to adjust to and prepare for the reentry of

that prisoner into the community." *Id.* § 3624(c)(1).

12.     Individuals on home confinement rely on an implicit promise that they will

remain on home confinement until the end of their sentence of imprisonment absent a violation of

the terms of home confinement. They and their families organize their lives around this implicit

promise. Individuals on home confinement reasonably expect to remain on home confinement

until the end of their time in BOP custody absent a violation. The reliance and expectation people have of remaining on home confinement absent a violation is reasonable.

13.     The implicit promise of remaining on home confinement absent a violation is derived from an analysis of the statutes and regulations governing home confinement, public communications from BOP leadership, the agreements the BOP requires people to sign when they commence home confinement, communications from BOP staff to individuals before they commence home confinement, communications from the Residential Reentry Centers (RRCs) to individuals they are supervising on home confinement, and the actual practices of the BOP with respect to re-imprisoning people on home confinement.

14.     On March 27, 2020, due to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) (2020), which expanded the authority of the BOP to place individuals on home confinement under 18 U.S.C. § 3624(c)(2)—previously capped at the shorter of 10% of their sentence or 6 months—provided that the Attorney General makes a finding that "emergency conditions will materially affect the functioning of the Bureau." Attorney General Barr made that finding on April 3, 2020, issuing a memo indicating that the BOP was "experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton." Noting the Bureau's "profound obligation to protect the health and safety of all inmates," Attorney General Barr directed the BOP to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions."[1]

---

[1]     Office of the Attorney General, *Memorandum for Director of Bureau of Prisons* (April 3, 2020), https://www.justice.gov/file/1266661/download.

15.     The CARES Act modifies only the length of time the BOP is authorized "to place a prisoner in home confinement" under "section 3624(c)(2) of title 18." CARES Act § 12003(a)(2), (b)(2), 134 Stat. 515, 516. Section 3624(c) gives the BOP authority to place federal prisoners with "lower risk levels and lower needs" on home confinement for "a portion of the final months of [their] term." 18 U.S.C. § 3624(c)(1)-(2). While the BOP may "lengthen" the home confinement period under the CARES Act, that period—however long it may be—is intended to be served during the "final months of [their] term."[2] The BOP's home confinement authority under Section 3624(c) is expressly intended to "afford th[e] prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." And Section 3624(c) directs that the BOP "shall, to the extent practicable," place eligible prisoners on home confinement "for the maximum amount of time permitted."

16.     In June 2020, then BOP Director Michael Carvajal testified before Congress along with BOP Medical Director Jeffrey Allen about BOP's response to the COVID-19 pandemic. The officials told Congress that BOP had begun aggressively screening individuals to be placed on home confinement "for service of the remainder of their sentences."[3]

17.     Before being placed on home confinement, an individual "signs an agreement which requires consent to submit to home visits and drug and alcohol testing, acknowledgement of monitoring requirements, and affirmation that he or she will not engage in criminal behavior or

---

[2]     *Compare* 18 U.S.C. § 3624(c)(2) (providing for home confinement authority as part of prerelease custody) *with* 18 U.S.C. § 3622 (providing for temporary release of a prisoner).

[3]     Dep't of Justice, Statement of Michael D. Carvajal, Director, and Dr. Jeffrey Allen, Medical Director, Director, Federal Bureau of Prisons Before the U.S. Senate Committee on the Judiciary, at 6 (June 2, 2020) (emphasis added), https://www.judiciary.senate.gov/imo/media/doc/Carvajal-Allen%20Joint%20Testimony.pdf (attached hereto as Exhibit 1).

possess firearms, among other terms."[4] "Through the use of independent contractors, or, less frequently, the U.S. Probation Office, individuals placed on home confinement are monitored electronically; have check-in requirements; and are subject to alcohol and drug testing and transfer back to secure correctional facilities if there are any significant disciplinary infractions or violations of the agreement."[5] On December 10, 2021, in describing the operation of the home confinement program under the CARES Act since its enactment, BOP General Counsel Kenneth Hyle explained: "Under regular circumstances, inmates who have made this transition to home confinement would not be returned to a secured facility, unless there was a disciplinary reason for doing so, as the benefit of home confinement is to adjust to life back in the community, and therefore removal from the community would obviously frustrate that goal."[6]

18.     BOP's Program Statement on Home Confinement provides that "[c]ompliance with the conditions of home confinement may be monitored by electronic monitoring equipment or by regular telephone or in person contacts by supervision staff."[7] "Supervision may be provided by staff from the U.S. Probation Service, contract halfway house services, or other

---

[4]      Memorandum for Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, from Kenneth Hyle, General Counsel, BOP, Re: Views Regarding OLC Opinion, "Home Confinement of Federal Prisoners After the COVID-19 Emergency," at 5 (Dec. 10, 2021), ("General Counsel Memo"), https://www.aclu.org/sites/default/files/field_document/bop_cares_memo_12.10.21.pdf (attached hereto as Exhibit 2).

[5]      *Id.*

[6]      General Counsel Memo, *supra* note 5, at 5.

[7]      BOP Program Statement 7320.01, CN-2, Home Confinement, at 2 (updated Dec. 15, 2017) https://www.bop.gov/policy/progstat/7320_001_CN-2.pdf (attached hereto as Exhibit 3).

governmental agencies."[8] "To be placed on home confinement, the inmate must sign the 'Conditions of Home Confinement' BP-460(73) prior to placement."[9]

19. The Home Confinement Program Statement requires BOP's CCMs (now called RRMs, or Residential Reentry Management field offices) to ensure a system is in place for handling violations of program rules that meets due process requirements and "includes provisions for dealing with minor infractions of program rules and with major infractions that could result in the inmate's termination from the program."[10]

20. Implicit in the home confinement program's concern with violations of the rules of home confinement is the notion that people on home confinement are entitled to retain their

---

[8]     *Id.* at 2.

[9]     *Id.* at 6. Form BP-A0458 appears to be currently-applicable form for people on home confinement and is available at https://www.bop.gov/policy/forms/BP_A0548.pdf (attached hereto as Exhibit 4). The form is titled "Home Confinement and Community Control Agreement" and begins with a statement that the individual signing "hereby agree[s] to abide by the following Conditions related to my legal participation on home confinement." *Id.* The form states: "I am aware that I will legally remain in the custody of the Bureau of Prisons and/or the U.S. Attorney General and that failure to remain at the required locations may result in disciplinary action and/or prosecution for escape"; "I agree to report to my assigned probation officer or the contractor's facility immediately upon reaching my release destination"; "I understand that if I decline to participate in the recommended home confinement program I may face administrative reassignment out of the community corrections program"; "I agree that during the home confinement period, I will remain at my place of residence, except for employment, unless I am given permission to do otherwise"; "I also understand that I will be required to pay the costs of the program based on my ability to pay"; "I also agree to maintain a telephone at my place of residence without 'call forwarding', a modem, 'Caller ID' or portable cordless telephones for this period"; and "I also agree that, if my confinement is to be electronically monitored, I will wear any electronic monitoring device required, following procedures specified and will not have 'call forwarding' on my telephone.").

[10]    *Id.* at 6. Another statutory provision, 18 U.S.C. § 3624(g)(5), applicable at least with respect to individuals on prelease custody (i.e., home confinement or RRC placement) under the First Step Act, shows further the home confinement program's concern with violations. *See id.* § 3624(g)(5) ("Violations of conditions.—If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the remainder of the term of imprisonment to which the prisoner was sentenced, or any portion thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons shall revoke the prisoner's prerelease custody.").

liberty as long as they substantially abide by the conditions of the home confinement program. The essence of home confinement is release from prison, before the completion of sentence, on the condition that the individual abide by certain rules during the balance of the sentence.

21.     BOP's policies and practices, as well as its governing statutes and statements from its leadership, have communicated an implicit promise that individuals will not be returned to prison absent a major infraction. Individuals on home confinement have relied on this implicit promise and reasonably expect to remain on home confinement absent major infractions.

**Ms. Cardoza's Initial Incarceration**

22.     At the time the COVID pandemic hit, Ms. Cardoza was serving her sentence at the minimum security women's Camp at FCI Danbury.[11] Because of the dangers of the pandemic and Ms. Cardoza's low public safety risk, the BOP released Ms. Cardoza from FCI Danbury to home confinement in May 2020 under the CARES Act.[12] *See* Third Declaration of Eva Cardoza ¶ 1  ("Cardoza Decl.") (attached hereto as Exhibit 5).

23.     Ms. Cardoza suffers from asthma, seizures, and post-traumatic stress disorder ("PTSD"). Ms. Cardoza's post-traumatic stress disorder stems from the abuse she has suffered throughout her life. Ms. Cardoza witnessed her father's physical and emotional abuse of her mother from a young age, and was later herself subject to her father's physical abuse. As a young

---

[11]     Ms. Cardoza was convicted of racketeering conspiracy, conspiracy to distribute narcotics, and managing a drug premises. An additional count of conviction—of accessory after the fact to murder—was reversed by the Second Circuit based on insufficient evidence that Ms. Cardoza was aware that a person she was driving had killed someone. *See United States v. Calderon*, 785 F.3d 847 (2d Cir. 2015). Ms. Cardoza had no criminal history prior to the instant convictions.

[12]     Ms. Cardoza was among the first set of individuals released on home confinement from FCI Danbury pursuant to a temporary restraining order requiring BOP to undertake expedited consideration for home confinement of individuals at higher risk for severe illness from COVID. *See Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350 (D. Conn. May 12, 2020).

woman, Ms. Cardoza was beat and raped. Thereafter, she was in multiple physically abusive relationships. During one attack, her abuser struck her in the head and she suffered a serious head injury. Following this injury, she has experienced seizures that are triggered by anxiety and stress.[13] *See* Ex. 5, Cardoza Decl. ¶¶ 15-16.

24.     At the time of her initial prosecution, Ms. Cardoza was living in Newburgh, New York and was the primary caregiver her 16-year-old son and her 3-year-old daughter. She worked for West Point Academy in the offices and mess hall until her seizures became so disabling that she had to go on social security disability.

25.     During the course of her imprisonment, Ms. Cardoza participated in numerous rehabilitative programs and earned her GED. She had an apprenticeship with the prison laundry and worked with the commissary, trust fund, warehouse, and electric teams. *Id.* ¶ 2.

**Ms. Cardoza's Time on Home Confinement**

26.     Ms. Cardoza was released to home confinement from the Camp at FCI Danbury under the CARES Act in May 2020. *Id.* ¶ 1.

27.     After COVID hit at FCI Danbury in spring 2020, Ms. Cardoza learned from staff that she would be released to home confinement under the CARES Act. BOP staff at the Camp told her and other women who had been approved for home confinement that they were going home for the rest of their sentences. BOP staff said women released to home confinement would be brought back to prison only if they violated the rules of the home confinement program. *Id.* ¶ 3; *see also* Declaration of Asha Maurya ¶ 5 ("Maurya Decl.") (attached hereto as Exhibit 6); Declaration of Alice Phillips ¶ 8 ("Phillips Decl.") (attached hereto as Exhibit 7).

---

[13]     Ms. Cardoza is prescribed carbamazepine to help control the seizures, but has been experiencing frequent seizures since her re-incarceration.

28.     After Ms. Cardoza was approved for home confinement, staff said: "You'll do your time there." Staff told her: "Congratulations" and "don't do anything that will bring you back." Staff never informed Ms. Cardoza that she could be brought back to prison for any reason other than a violation. Ms. Cardoza was required to sign paperwork before her release to home confinement. Ex. 5, Cardoza Decl. ¶ 4. Ms. Cardoza understood from communications with staff that she would remain on home confinement unless she violated a rule of the home confinement program. *Id.* ¶ 7.

29.     Ms. Cardoza communicated with other women who had been approved for home confinement at around the same time as her. The other women also understood from BOP staff that they were going to be on home confinement for the rest of their sentences and would be brought back to prison only if they violated the rules. Some of the women, like her, had substantial time left on their sentences. Everyone was thankful that they were being allowed to serve the rest of their sentences at home and viewed this as "a blessing." *Id.* ¶ 5.

30.     In both April and May 2020, upper-level BOP staff held multiple Town Hall meetings at the Camp to discuss COVID protocols and the home confinement process. Speaking at these Town Hall meetings were Warden Easter, Ms. Moore, and Ms. Foreman. Women were concerned about being released temporarily and then sent back to prison when the pandemic was over. No one knew at that time how long the pandemic would last. Some women said they wouldn't want to go home if they would have to come back after the pandemic. They asked if the release was temporary. Warden Easter, Ms. Moore, and Ms. Foreman reassured that the only way the women would be brought back to prison would be if they committed misconduct. They said: "The only way you are coming back is if you put yourself here" and "you are the only ones who can send you back." Ex. 7, Phillips Decl. ¶¶ 5-8.

31.     Since she has been in BOP custody, Ms. Cardoza has understood that home confinement is the final stage of your time in BOP custody and is intended to prepare you for life outside of prison in the community. She has understood that there is a difference between home confinement—where you remain at home until your time with BOP is done—and a furlough, where you usually come back to prison. Ex. 5, Cardoza Decl. ¶ 6.

32.     Ms. Cardoza relied on her understanding that she would serve the rest of her sentence at home unless she committed misconduct. She relied on this promise when she reestablished a close relationship with her daughter, become engaged to her fiancé, and became a mother to his children. Her family relied on this understanding as well. *Id.* ¶ 7. While on home confinement, Ms. Cardoza never heard of someone being sent back to prison except in instances where BOP alleged misconduct. *Id.* ¶ 8.

33.     While on home confinement, Ms. Cardoza re-established strong personal and community ties. She rebuilt her relationship with her family and became central in the everyday lives of her sick mother, fiancé, and their children, especially her daughter (who was age 13 when she came home and is now 15). After initially staying with her mother, Ms. Cardoza lived in Walden, New York with her fiancé, Eric Alvarez, and their children. *Id.* ¶ 10.

34.     Throughout her time on home confinement, Ms. Cardoza was supervised by the Bronx Community Reentry Center ("RRC"), which is run by the corporation GEO Group, Inc. and contracts with BOP to provide supervision to individuals placed on home confinement in the area. *Id.* ¶ 17. When Ms. Cardoza was first released, RRC staff placed an ankle bracelet on her and told her all the rules of the home confinement program. *Id.* ¶ 9.

35.     Ms. Cardoza's home is approximately 1.5 to 2 hours away from the RRC. Ms. Cardoza attended every appointment at the RRC despite the transportation costs often exceeding

$200 in cab fare. Throughout her time on home confinement, she was required to report to the RRC between one and four times a month. *Id.* ¶ 17.

36.    Ms. Cardoza, while on home confinement, was routinely tested once a month by the RRC for controlled substance use. Prior to June 1, 2021, she had received no incident reports—reports produced by the BOP when the agency asserts someone in its custody has violated its rules—while on home confinement, nor faced any allegation of use of an illicit substance. *Id.* ¶ 19.

37.    Ms. Cardoza was her family's primary caregiver while on home confinement. After initially living with her mother and daughter (now 15), she moved into the home of her fiancé and his three young children (now ages 14, 12, and 10), and older son (age 26), who suffers from a severe disabilities. The father of Ms. Cardoza's daughter is incarcerated. Mr. Alvarez has sole custody of his minor children, who have not been cared for by their mother for the past five years. *Id.* ¶ 10; Second Declaration of Eric Alvarez ("Alvarez Decl.") ¶ 2 (attached hereto as Exhibit 8).

38.    Ms. Cardoza oversaw getting the children ready for school, assisted them with schoolwork, cooked for her family, washed clothes, and cleaned the home. She applied for and received "passes" from the RRC to complete the grocery shopping, and she never left the home without a pass. Ex. 5, Cardoza Decl. ¶¶ 12, 19; Ex. 8, Alvarez Decl. ¶ 8.

39.    Ms. Cardoza also cared for her fiancé, Mr. Alvarez, who suffers from serious ailments including multiple heart conditions (coronary artery disease, mitral valve regurgitation, and chronic combined systolic and diastolic heart failure), type 2 diabetes, asthma, hypertension, and mixed hyperlipidemia. Mr. Alvarez has a stroke and heart attack history and has three stents

in his heart. He has a history of lung cancer (now in remission) and was diagnosed in August 2022 with colon cancer. Ex. 5, Cardoza Decl. ¶ 11; Ex. 8, Alvarez Decl. ¶¶ 4-5.

40.     Mr. Alvarez has been on disability for the past two decades. As a result of his heart condition, he is unable to exert himself or lift anything heavier than 5 pounds. His heart condition often renders him so weak that he is unable to care for himself, Ms. Cardoza's care for him included overseeing his medications and cooking for him. At times, Ms. Cardoza had to assist him by washing his body and feeding him. Ex. 5, Cardoza Decl. ¶ 11; Ex. 8, Alvarez Decl. ¶ 11.

41.     In addition for caring for her fiancé and the four younger children, Ms. Cardoza cared for her fiancé oldest son, age 26, who suffers from severe developmental disabilities as a result of oxygen deprivation at birth, experiences seizures, is almost blind, and has Albinism. Ex. 5, Cardoza Decl. ¶ 10; Ex. 8, Alvarez Decl. ¶ 9.

42.     Ms. Cardoza also provided necessary help with housework and cooking for her mother, who suffers from diabetes and lives alone. Ex. 5, Cardoza Decl. ¶ 13; Ex. 8, Alvarez Decl. ¶ 10.

43.     While she was on home confinement, Ms. Cardoza did not hear of anyone being brought back into prison for reasons other than a violation. Ex. 5, Cardoza Decl. ¶ 8.

44.      According to BOP's website, Ms. Cardoza's prison sentence is projected to expire on or around December 2, 2024.

**Disciplinary Action Against Ms. Cardoza**

45.     On June 7, 2021, Ms. Cardoza was informed by RRC staff that the urine sample they collected from her on June 1, 2021, had allegedly tested positive for marijuana. She was instructed to report to the RRC, which she did. Ex. 5, Cardoza Decl. ¶ 20.

46.     When Ms. Cardoza arrived at the RRC on June 7, at approximately 2:30pm, staff gave her an incident report charging her with a violation of Code 112 of the BOP's Inmate Discipline Program,[14] which it described as "use of any narcotics or related paraphernalia not prescribed for the individual by medical staff."

47.     A little over an hour after receiving the incident report, Ms. Cardoza met with staff to discuss the incident. Ex. 5, Cardoza Decl. ¶ 21.

48.     After this meeting, RRC staff did not inform Mr. Cardoza that she would be taken into custody. Instead, staff told her that they were recommending a sanction of a loss of 41 days of good time credit—the credit an individual earns toward shortening one's federal sentence—and were not recommending re-imprisonment. *Id.* ¶ 22.

49.     In fact, BOP had already determined Ms. Cardoza would be re-imprisoned. On the morning of June 7, 2021, after learning that RRC staff intended to meet with Ms. Cardoza to initiate a discipline process for an alleged positive marijuana test—and before Ms. Cardoza even had a chance to discuss the incident with RRC staff—BOP Residential Reentry Manager Patrick McFarland told the RRC that Ms. Cardoza would be remanded to prison. *See* McFarland Email Exchange (attached hereto as Ex. 9).[15]

50.     On June 8, 2021, the Disciplinary Hearing Officer ("DHO") determined that Ms. Cardoza's sanction for a violation of Code 112 was 41 days loss of good time credit. The DHO

---

[14]     A list of conduct that can result in disciplinary sanctions by BOP is set forth in 28 C.F.R. § 541.3 ("Prohibited acts and available sanctions"). BOP Program Statement 5270.09 further describes the BOP's Inmate Discipline Program. *See* https://www.bop.gov/policy/progstat/5270_009.pdf.

[15]     On June 7 at 10:55am, Mr. McFarland instructed staff at the RRC in an email: "conduct investigation and cdc. Once sent to dho we will send remand and you can pull the inmate in house from home detention to be remanded. thank you." *See* Ex. 9, McFarland Email Exchange. Ms. Cardoza did not receive the incident report until approximately 2:30pm on June 7, and did not speak to staff about the incident until after she received the report.

decision said nothing relating to revocation of home confinement. Ms. Cardoza did not have an opportunity to appear in front of the DHO. Ex. 5, Cardoza Decl. ¶ 27.

51.     On or around June 8, 2021, Ms. Cardoza was told to report to the RRC. She was told she would have to stay there for a period of time and to bring clothes. She was not told she was being re-imprisoned. Ms. Cardoza followed these instructions and reported to the RRC. *Id.* ¶¶ 23-24.

52.     Soon there after, U.S. Marshals detained Ms. Cardoza at the RRC and brought her to the Metropolitan Detention Center Brooklyn (MDC Brooklyn). *Id.* ¶ 25.

53.     Ms. Cardoza never appeared in front of the DHO or a BOP official before being re-imprisoned. *Id.* ¶ 27.

54.     Ms. Cardoza did not receive the evidence underlying her incident report or a hearing before BOP decisionmakers before she was re-imprisoned. She did not receive the opportunity at a hearing before decisionmakers to present witnesses or evidence in support of remaining on home confinement or to cross-examine adverse witnesses; did not have the determination of imprisoning her made before a neutral and detached decisionmaker who had heard the evidence; and did not receive a written statement by the decisionmakers as to the decision to revoke her home confinement, the evidence relied upon in reaching the decision, and reasons for revoking home confinement. *Id.* ¶ 28.

55.     The June 7, 2021 meeting with RRC staff was not a hearing before a neutral and detached decisionmaker.

56.     Marijuana is legal for recreational use in the State of New York for adults over the age of 21.

**The Impact of Ms. Cardoza's Re-Imprisonment**

57.     On August 25, 2021, Ms. Cardoza was transferred to FCI Danbury, where she has been incarcerated since in the minimum-security women's Camp. Ex. 5, Cardoza Decl. ¶ 26.

58.     When she was re-imprisoned, Ms. Cardoza was not told how long she would have to remain in prison. One officer who worked in the processing department at FCI Danbury told her that her sanction was 90 days. Another staff member told her that her first ticket should not mean she would have to be re-imprisoned. Finally, her unit manager told her that she would remain in prison until the end of her sentence in December 2024. *Id.* ¶ 29.

59.     Since being re-incarcerated, Ms. Cardoza has worked in housekeeping services, working long days despite her seizures and health issues. She currently serves as head orderly for the counselor at the Camp at FCI Danbury, and has been participating in programs and classes. *Id.* ¶ 35.

60.     Since she was re-imprisoned, Ms. Cardoza's daughter and stepchildren have been living with her fiancé. *Id.* ¶ 30; Ex. 8, Alvarez Decl. ¶ 14.

61.     During the summer of 2021, shortly after BOP re-imprisoned Ms. Cardoza, Ms. Cardoza's daughter (then 14 years old) was the victim of sexual assault. The perpetrator has since been charged, tried, convicted, and sentenced for the assault. Both Ms. Cardoza's daughter and her fiancé had to give testimony at the trial about this traumatic event. Her assailant was found guilty on April 4, 2022. On July 6, 2022, Ms. Cardoza's daughter had to face her assailant again to give a victim impact statement. Ms. Cardoza's daughter's physical and mental health has deteriorated severely since the assault and Ms. Cardoza's incarceration. Ms. Cardoza's daughter misses her mother terribly and is high distressed. She has been having seizure-like episodes and

has been engaging in self-harm. She has faced the trauma of the assault and its aftermath without the support of her mother. Ex. 5, Cardoza Decl. ¶ 31; Ex. 8, Alvarez Decl. ¶ 15.

62.     Before being re-imprisoned, Ms. Cardoza had been the primary caregiver of the children because her fiancé's debilitating health issues. It has been extremely difficult for Mr. Alvarez to care for the children on his own with Ms. Cardoza. Ex. 5, Cardoza Decl. ¶ 32; Ex. 8, Alvarez Decl. ¶ 14. The children are really suffering without Ms. Cardoza home. *See* Letters from Children (attached hereto as Exhibit 10); *see also* Photo of Children with Mr. Alvarez (attached hereto as Exhibit 11).

63.     In January 2022, Mr. Alvarez was suffering from serious COVID complications and his doctors wanted to admit him to the hospital. However, Mr. Alvarez did not go to the hospital as there was no one else to care for the children. He currently needs surgery for a torn rotator cuff in his shoulder and a stent replacement in his heart but has been forced to postpone it because of his caregiving responsibilities. Ex. 8, Alvarez Decl. ¶ 16.

64.     Mr. Alvarez began experiencing intermittent gastrointestinal problems approximately four years ago. Five to six months ago, the pain in his abdomen became more severe and consistent. In late June 2022, the pain (along with rectal bleeding and a constant need to use the bathroom) was so severe that he went to the emergency room. Soon after, he saw a gastroenterologist, who ordered a colonoscopy and endoscopy with biopsy. The colonoscopy revealed colon cancer. Mr. Alvarez is awaiting the results of the biopsy, which will show the extent of the cancer's growth. Mr. Alvarez continues to have intense pain and is unable to stand up straight or walk normally given the pain he is experiencing. His doctor is considering what course of treatment he can withstand given his heart condition. *Id.* ¶¶ 17-19.

65.     All of the couple's children are suffering without the support of Ms. Cardoza and in light of Mr. Alvarez's serious deterioration. Ms. Cardoza's daughter found Mr. Alvarez unable to get off the bathroom floor because of the pain and she is terrified that he will die and leave her with no one. Ms. Cardoza lives in constant fear Mr. Alvarez will have a heart attack and the children will find him dead. Each day she is anxious to speak to him to be sure he is still alive. Ex. 5, Cardoza Decl. ¶ 33.

66.     In addition, as a result of the BOP's re-imprisonment of Ms. Cardoza, Ms. Cardoza's mother, who suffers from diabetes, is now without a reliable caregiver. She lives alone and only gets help when Ms. Cardoza's sister is available from time to time to help her. *Id*. ¶ 34.

67.     Ms. Cardoza's seizures are exacerbated by stress, and as a result, her physical and mental health has suffered greatly during incarceration. Since returning to prison, Ms. Cardoza has experienced extreme stress, depression, anxiety, and anguish from not being able to care for her family and provide support for her daughter in the wake of her assault. Her seizures and anxiety have worsened, and many days Ms. Cardoza finds it difficult to get out of bed and take care of herself and her work. Ms. Cardoza's most recent seizure occurred on August 13, 2022. Fellow residents at the Camp informed her she had been unconscious for awhile and she emerged from the seizure confused and disoriented with drooping on her left side. Ex. 5, Cardoza Decl. ¶ 35-36; Ex. 8, Alvarez Decl. ¶ 20.

68.     If Ms. Cardoza is released, she would live with her Mr. Alvarez, her fiancé, in their apartment in Walden, NY. Their children will also reside with them. Ex. 5, Cardoza Decl. ¶ 38; Ex. 8, Alvarez Decl. ¶ 21.

69.     Ms. Cardoza's continued incarceration will cause irreparable harm in that she is unable to care for her family, including her ill fiancé, diabetic mother, daughter who was the victim of sexual assault, and stepchildren who are suffering without her support.

70.     Ms. Cardoza's continued incarceration will cause irreparable harm to her health in that she has been suffering from an increase in anxiety, seizures, and PTSD symptoms since being imprisoned.

71.     There is no statutory requirement of exhaustion in this case.

72.     On information and belief, there was no administrative remedy available to Ms. Cardoza while on home confinement to prevent her current imprisonment.

73.      After her re-imprisonment, the BOP's actions have interfered with Ms. Cardoza's ability to administratively challenge the BOP's actions in imprisoning her. Nevertheless, Ms. Cardoza has made significant efforts to bring to the BOP's attention complaints about being re-imprisoned. Indeed, she has exhausted her administrative remedies.

74.     The U.S. Marshals prohibited Ms. Cardoza from taking her incident report and appeals paperwork from the RRC to MDC Brooklyn. Once she arrived at MDC Brooklyn, Ms. Cardoza was immediately placed in quarantine in the SHU (restrictive housing) for approximately 14 days. Once Ms. Cardoza was released from quarantine, on August 5, 2021, Ms. Cardoza requested a copy of the incident report and appeals paperwork. Staff at MDC Brooklyn did not give her the materials. Ex. 5, Cardoza Decl. ¶¶ 39-40. When Ms. Cardoza arrived at FCI Danbury, she again requested her incident and appeals paperwork. Staff told her that the time for the appeal had passed and did not provide the materials. Although she was not given an administrative remedy form, Ms. Cardoza submitted a written appeal to the Regional Director on September 21, 2021. *Id.* ¶ 41. On May 31, 2022, Ms. Cardoza mailed an appeal on a BP-11 form to the General

Counsel at BOP's Central Office. *Id.* ¶ 42. On July 27, 2022, when she had not received a response within the required 40-day period, she notified the Court that she had exhausted her administrative remedies. Notice of Administrative Exhaustion (Dkt. 30).

75.     On July 30, 2022, Ms. Cardoza's case manager at FCI Danbury brought her the appeal that she had mailed to the Office of General Counsel. The BP-11 was stamped as received on July 6, 2022. The response said that the grievance was being rejected because it should have been submitted to the Institution. However, the response also included a statement that appeals relating to 100 and 200-level violations should be submitted to the Regional Director. That sentence was marked on both sides by a handwritten star, thus appearing to indicate Ms. Cardoza's appeal instead should be submitted to the Regional Director. Although the response was dated July 8, 2022, BOP did not give Ms. Cardoza the response until July 30, 2022. BOP staff did not inform her why they waited until July 30, 2022 to give her the response. Ex. 5, Cardoza Decl. ¶ 43.

76.     It would be futile to require Ms. Cardoza to further pursue administrative remedies. Respondents-Defendants have expressly argued in litigation that Ms. Cardoza was not entitled to any process before her home confinement was revoked and have asserted that Ms. Cardoza's positive marijuana test provided a nonarbitrary, rational reason for remanding her to prison. The BOP has not demonstrated an openness to reconsidering its decision to re-imprison Ms. Cardoza. The purposes behind the requirement of exhaustion are no longer served by requiring Ms. Cardoza to continue to seek an administrative remedy in this case.

## COUNT ONE

### (Violation of Procedural Due Process)

77.     Petitioner-Plaintiff realleges and incorporates by reference each and every allegation contained in the proceeding paragraphs as if set forth fully herein.

78.     Ms. Cardoza has a liberty interest, protected by the Due Process Clause of the Fifth Amendment, in remaining on home confinement.

79.     Procedural protections are due to individuals on home confinement, such as Ms. Cardoza, before home confinement can be revoked because (1) the nature of their interest in continued liberty on home confinement is within the "liberty or property" language of the Fifth Amendment and (2) revocation of home confinement causes them to suffer a grievous loss.

80.     Individuals on home confinement, such as Ms. Cardoza, are able to do a wide range of activities open to people who have never been convicted of crimes including living at home with their families, seeking and maintaining gainful employment, pursuing their education, connecting with others in their communities, caring for their loved ones, and forming other enduring attachments of normal life. Although individuals on home confinement are subject to restrictions, their situation is very different from that of confinement in a prison.

81.     Individuals on home confinement, including Ms. Cardoza, have relied on at least an implicit promise that parole will be revoked only if they violate the conditions of home confinement. The implicit promise has been communicated through BOP practices, policies, statements, and governing statutes. Individuals on home confinement have a reasonable expectation that they will not be subject to re-imprisonment by the BOP absent major violations of the conditions of the home confinement program.

82.     Ms. Cardoza, specifically, relied on communications from BOP staff that she would serve the rest of her sentence at home absent a violation. Staff at FCI Danbury specifically communicated that she would be brought back to prison only if she committed misconduct. Ms. Cardoza was never informed that she could be brought back absent cause.

83.     Ms. Cardoza and her family relied on at least an implicit promise that she would remain at home absent a violation and they had a reasonable expectation that she would remain at home until the end of her sentence absent a major violation of the terms of home confinement.

84.     Respondents-Defendants' re-imprisonment of Ms. Cardoza caused her to suffer a grievous loss and imposed a substantial hardship as BOP separated her from her ill fiancé and mother, young daughter, and stepchildren and forced her to leave her home and community.

85.     Under the Due Process Clause, before re-imprisoning Ms. Cardoza, the BOP was required to provide Ms. Cardoza with: (1) written notice of the claimed violations of home confinement and the fact that she faced the possibility of re-imprisonment; (2) disclosure of the evidence against her; (3) the opportunity to be heard in person before a neutral and detached decisionmaker and to present witnesses and documentary evidence as to the alleged misconduct and as to whether revocation was warranted should the allegations be established; (4) the right to confront and cross-examine adverse witnesses at the hearing; and (5) a written statement by the decisionmaker as to the evidence relied on and reasons for revoking home confinement. *See Young v. Harper*, 520 U.S. 143 (1997); *Morrissey v. Brewer*, 408 U.S. 471 (1972). Given the manner in which her PTSD and anxiety impair her ability to effectively advocate for herself, Ms. Cardoza also had a due process right to the assistance of her counsel in the revocation process. *See Gagnon v. Scarpelli*, 411 U.S. 778, 791 (1973).

86.     Respondents-Defendants' re-imprisonment of Ms. Cardoza violates procedural due process because it deprived Ms. Cardoza of adequate notice, the ability to review and confront the evidence against her, the right to a hearing in front of a neutral and detached official making the revocation decision, and the reasons for revoking home confinement.

87.     Respondents-Defendants' denial of Ms. Cardoza's access to counsel in the revocation proceeding also violates her procedural due process rights.

**COUNT TWO**
**(Declaratory Judgment Act)**

88.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

89.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

90.     There is an actual controversy between the parties because Respondents-Defendants have refused to provide Ms. Cardoza with adequate process before re-imprisoning her in violation of the Due Process Clause. The Court should exercise its authority under the Declaratory Judgment Act to declare that Respondents-Defendants have violated Ms. Cardoza's Constitutional rights.

**REQUEST FOR ENLARGEMENT AS A PROVISIONAL REMEDY**

91.     Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is a provisional remedy that modifies custody by expanding the site at which it takes place, upon order of the court, from a particular prison to another setting.

92.     The enlargement power stems from Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require" as well as the courts' inherent powers. *See* 28 U.S.C. § 2243.

93.     To qualify for the enlargement remedy, an individual must show "unusual" or "extraordinary circumstances" and that the underlying claim raises "substantial claims." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).

94.     As set forth more fully in the attached Memorandum in Support of Enlargement Request, extraordinary circumstances exist given that Ms. Cardoza continued imprisonment will cause irreparable harm to the physical and mental wellbeing of herself, her fiancé, and their children.

95.     Ms. Cardoza has also raised substantial claims, as she was summarily imprisoned by the Respondent-Defendants without the opportunity to present and rebut evidence relating to the revocation decision in front of a neutral decisionmaker, and with no notice of the basis for the revocation decision and the evidence relied upon.

96.     Ms. Cardoza requests that the Court enlarge her custody to permit her to live at home in Walden, NY with her fiancé and their children subject to the restrictions in place prior to her re-imprisonment. In support of her enlargement request, Ms. Cardoza relies on the attached memorandum.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner-Plaintiff respectfully requests that the Court:

a) Grant enlargement to Ms. Cardoza pending disposition of the underlying habeas petition and allow her to go home to her family;

b) Enter a judgment against Respondents-Defendants and award the following relief:

    a. Grant a writ of Habeas Corpus requiring Respondents-Defendants to release Ms. Cardoza immediately or issue an order directing them to show cause within three days why the Writ of Habeas Corpus should not be granted, pursuant to 28 U.S.C. § 2243;

    b. Declare that Respondents-Defendants have no basis under the Due Process Clause of the Fifth Amendment to imprison Ms. Cardoza;

    c. Declare Ms. Cardoza's imprisonment unlawful;

    d. Enjoin Respondents-Defendants from imprisoning Ms. Cardoza until they provide her the rights she is entitled to;

    e. Award Petitioner-Plaintiff's reasonable attorneys' fees and costs; and

    f. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: August 16, 2022

*/s/  Sarah F. Russell*
Sarah F. Russell, ct26604
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
Telephone: (203) 582-5258
Email: sarah.russell@quinnipiac.edu