## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**EVA CARDOZA**,

                                   *Petitioner-Plaintiff*,                    Civil Action No. 22-591

                    v.

**TIMETHEA PULLEN**, Warden of Federal
Correctional Institution Danbury, in her official          August 16, 2022
capacity,

**PATRICK MCFARLAND**, Residential
Reentry Manager, in his official capacity, and

**COLETTE S. PETERS**, Director, Federal
Bureau of Prisons, in her official capacity,

                    *Respondents-Defendants.*

## PETITIONER-PLAINTIFF'S SECOND MEMORANDUM IN SUPPORT OF REQUEST FOR ORDER OF IMMEDIATE ENLARGEMENT AS A PROVISIONAL REMEDY AS THE COURT CONSIDERS HER HABEAS ACTION

The BOP separated Petitioner-Plaintiff Eva Cardoza from her ill fiancé, the couple's children, and her mother, and re-imprisoned her based on single positive urinalysis test for marijuana and with no opportunity to tell a decisionmaker why imprisonment was unwarranted. Ms. Cardoza's imprisonment and separation from her family is exacerbating her post-traumatic stress disorder, anxiety, and depression and causing her to have more frequent seizures. Her 15-year-old daughter, a recent victim of sexual assault, desperately needs her mother and is distraught to the point of engaging in self-harm. Ms. Cardoza's fiancé (Eric Alvarez), who suffers from severe heart conditions and other ailments, has been alone for more than a year caring for the couple's four young children and older disabled son. In the past two months, the

family situation has become even more dire as Mr. Alvarez has been experiencing debilitating pain in his abdomen and was just diagnosed with colon cancer.

With her amended Petition-Complaint, Ms. Cardoza supplies evidence not only of the grievousness of the loss of her liberty but also of her reasonable reliance on an implicit promise that she would remain on home confinement absent a violation of the rules of the home confinement program. She has thus demonstrated that the BOP acted in violation of decades of U.S. Supreme Court and Second Circuit precedent establishing the due process rights of people in community release programs facing re-imprisonment.

This Court can and should grant Ms. Cardoza's request to enlarge her custody during the pendency of this habeas action. Indeed, two federal district courts have recently granted enlargement requests in closely analogous circumstances. *See* Order, *Lallave v. Martinez et al.*, 1:22-cv-00791-NGG (E.D.N.Y. Feb. 11, 2022) (granting enlargement request within hours of habeas petition being filed on behalf of woman challenging her re-imprisonment based on allegation of a positive marijuana test);[1] Order, *Daniels v. Martinez, Jr. et al.*, 1:22-cv-00918-LDH (E.D.N.Y. Feb. 23, 2022) (granting enlargement request five days after petition filed on behalf of woman BOP re-imprisoned based on allegation of possession of alcohol).[2] As in those

---

[1]     As in Ms. Cardoza's case, the BOP re-imprisoned Ms. Lallave without a hearing in front of a neutral and detached decisionmaker and with no explanation of the reasons for the revocation decision. Instead, Ms. Lallave's only chance to discuss the allegation of misconduct was at a meeting with staff of the Bronx Community Reentry Center, who had no decisionmaking authority and did not inform her that she faced re-imprisonment. Like Ms. Cardoza, Ms. Lallave asserted claims under the Due Process Clause. Within hours of her filing her petition-complaint and requesting enlargement as a provisional remedy, Judge Garaufis entered an order of enlargement directing the BOP to release Ms. Lallave home forthwith pending the resolution of the case.

[2]     In Ms. Daniels' case, as in Ms. Cardoza's case, the BOP provided no hearing before a neutral and detached decisionmaker before sending Ms. Daniels to prison from the Bronx Community Reentry Center. Ms. Daniels filed a petition-complaint, raising Due Process claims

cases, and as discussed below, Ms. Cardoza has demonstrated circumstances warranting enlargement pending adjudication of her Petition-Complaint.

With its initial decision to place Ms. Cardoza on home confinement, the BOP concluded that she did not present a risk to public safety. The allegation of misconduct asserted against her—a single positive test for marijuana—does not render her dangerous to the community. Indeed, her continued confinement is harming the wellbeing of her family. The BOP is currently housing Ms. Cardoza at a minimum-security Camp with no perimeter fencing. Ms. Cardoza asks that the Court immediately enlarge her place of custody so that she may return home to care for her family members who desperately need her.

## I.    Enlargement is Appropriate and Necessary Here

Enlargement is a provisional remedy that federal courts may order in habeas cases that modifies custody, pending adjudication of a case, by expanding the site at which the custody takes place. An order of enlargement pending the merits of a habeas decision is appropriate if the case is "unusual" or involves "extraordinary circumstances" and the habeas petition raises "substantial claims." *See Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (stating that a "habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective," and the petition raises "substantial claims") (internal quotation marks omitted).[3] As discussed below, Ms. Cardoza has established both requirements for enlargement relief.

---

and requesting enlargement. Five days later, Judge DeArcy Hall granted the request for enlargement, ordering Ms. Daniels to be released forthwith and for the BOP to "reinstitute the status quo prior to remand."

[3]    In *Mapp*, the court used the term "bail" instead of enlargement. When a court grants an enlargement request, the petitioner remains legally in custody, but the place of custody is changed, or "enlarged," upon order of the court, from a particular prison to a hospital, halfway

**A.      This Case Involves Extraordinary Circumstances and is Unusual**

The harm resulting from Ms. Cardoza's separation from her family is profound. At the time of her re-imprisonment, Ms. Cardoza was providing crucial care for her ill fiancé, the couple's children, and her mother. Letters from the children describe the impact of Ms. Cardoza's absence on their lives. *See* Ex. 10, Letters from Children; *see also* Ex. 11, Photo of Children with Mr. Alvarez.

Ms. Cardoza's 15-year-old daughter is suffering terribly with her mother in prison. During the summer of 2021, shortly after the BOP re-imprisoned Ms. Cardoza, Ms. Cardoza's daughter (then 14 years old) was the victim of a horrible sexual assault. Ms. Cardoza's daughter was required to give emotional and traumatic testimony at the trial of her assailant and provided a victim impact statement at her assailant' sentencing in July 2022. She desperately needs the support of her mother and is distressed to the point of engaging in self-harm. Ms. Cardoza, herself a survivor of sexual assault, wants more than anything to care for her daughter as she grapples with the trauma stemming from the recent assault. *See* Ex. 10, Letter from Daughter at 1-2; Ex. 5, Cardoza Decl. ¶¶ 31, 35; Ex. 8, Alvarez Decl. ¶ 15.

Ms. Cardoza's fiancé, Eric Alvarez, is trying to support Ms. Cardoza's daughter at this extraordinarily challenging time. Yet he also must care for his own three young children, of whom he has sole custody, and his older son who has severe disabilities. Mr. Alvarez is the only caregiver for all of these children while he suffers himself from severe heart problems (including coronary artery disease, three stents in his heart, and a heart attack history). He has delayed

---

house, a person's home, or another setting. *See* Declaration of Professor Judith Resnik Regarding Enlargement and the Use of Provisional Remedies for Detained Individuals ¶¶ 28-29, *Whitted v. Easter*, 20-cv-569 (MPS) (Dkt. 1, Ex. B). Enlargement is part and parcel of Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

much-needed stent replacement surgery because there is no one else who can care for the kids. *See* Ex. 5, Cardoza Decl. ¶¶ 11-12, 32-33; Ex. 8, Alvarez Decl. ¶¶ 4-5, 14-16. In late June 2022, Mr. Alvarez went to the emergency room after pain in his abdomen became unbearable and had other alarming symptoms including rectal bleeding. A colonoscopy recently revealed Mr. Alvarez has colon cancer, and he is awaiting results of a biopsy to learn the extent of the cancer's spread. Ex. 8, Alvarez Decl. ¶¶ 17-19. Ms. Cardoza's mother, who is diabetic, is also without the support of her daughter. Ex. 5, Cardoza Decl. ¶ 34.

The continued confinement of Ms. Cardoza during this traumatic time for her and her family has exacerbated her PSTD, anxiety, and depression and increased the frequency of her seizures. Ms. Cardoza suffers from PTSD based on her long and severe history of trauma and abuse. Her seizures are triggered by anxiety and stress and have increased in frequency since her re-incarceration, despite her taking prescribed medication (carbamazepine) to try to control them. Just a few days ago, she had another severe seizure. Ex. 5, Cardoza Decl. ¶ 35-36; Ex. 8, Alvarez Decl. ¶ 20.

Ms. Cardoza seeks an order of enlargement to be with her daughter as she struggles with the trauma of the assault, and so that she can provide much needed support to Mr. Alvarez, the couple's other children, and her mother. Extraordinary and unusual circumstances exist given the needs of Ms. Cardoza's family, the impact of her incarceration on her own health, and nature of Ms. Cardoza's habeas claim.

This habeas petition seeks to redress the harm imposed by BOP's home confinement revocation practices. The central claim of this petition is that Ms. Cardoza should have had notice of the BOP's intent to re-imprison her and provided the opportunity *to have her case heard*; that is, that she should have been able to bring to the BOP decisionmakers the role she

plays in her family, the need to provide care for them, and any other reasons why the BOP should have allowed her to remain on home confinement. The harm that Ms. Cardoza and her family are suffering as a result of the BOP's unlawful imprisonment every day is irreparable, and the habeas seeks to redress this harm. Her family's need for her has only grown during her unlawful reimprisonment.

Courts have recognized that poor or worsening health during incarceration can constitute "extraordinary" or "unusual" circumstances justifying enlargement even when the habeas petition was not itself about the health issue. For example, in *S.N.C. v. Sessions*, No. 18 CIV. 7680 (LGS), 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018), the court granted release of a woman detained by immigration authorities whose PTSD and depression were exacerbated by her detention and separation from her young children, where the habeas petition sought to stop her removal from the country under the Administrative Procedure Act and the Due Process Clause. In considering her health circumstances, the court noted that her "personal circumstances are not that of the usual "Petitioner." *Id.* at *6. Other courts have also considered, as is proper in determining whether to enlarge custody, health conditions. *See D'Alessandro v. Mukasey*, No. 08CV914RJAVEB, 2009 WL 799957, at *4 (W.D.N.Y. Mar. 25, 2009) (concluding that "D'Alessandro's chronic and debilitating health conditions, while not 'emergent,' according to Dr. Bailey, certainly constitute exceptional circumstances setting his case apart and making bail necessary to make the habeas remedy effective, and to prevent further deterioration of his health" and stating that "the grant of bail is 'necessary to make the habeas remedy effective' in this case because the relief sought by D'Alessandro in his habeas petition *is* release from detention in DHS/ICE custody") (emphasis in original); *Kiadii v. Decker*, 423 F. Supp. 3d 18, 21 (S.D.N.Y. 2018) (granting bail to habeas petitioner, noting that "[t]he fact of Petitioner's deteriorating

health," which included a painful lump in her breast, "supports her request for release"); *Leslie v. Holder*, 865 F. Supp. 2d 627, 639 (M.D. Pa. 2012) (observing that petitioner's "physical health, and the cascading array of medical problems described by this 59 year-old detainee who suffers from coronary, intestinal, neurological and skeletal complaints, presents extraordinary concerns of the type which have in the past justified bail consideration"); *United States v. Mett*, 41 F.3d 1281, 1282 n.4 (9th Cir. 1995) (internal quotation marks omitted) (noting that "[s]pecial circumstances" warranting bail in habeas cases "include a serious deterioration of health while incarcerated"). Here, not only is Ms. Cardoza's health deteriorating, but her detention is impacting the physical health of fiancé and the emotional and physical well-being of her young daughter.

Courts have recognized that the harms resulting from family separation can justify enlargement. In addition to *S.N.C.*, discussed above, in *Lallave v. Martinez*—litigated by undersigned counsel and challenging the lack of process in BOP home confinement revocation— the district court granted the request for enlargement where the alleged misconduct was identical to this case (a single positive test for marijuana), and the family circumstances were also extraordinary (in that case, the petitioner was taking care of her 10-month-old baby). *See* Petition, *Lallave v. Martinez*, 22-CV-791 (NGG) (E.D.N.Y. Feb. 11, 2022) (Dkt. 1) (describing Ms. Lallave's family circumstances); Order of Feb. 11, 2022 (granting enlargement).

In addition to the extraordinary harm resulting from Ms. Cardoza's re-imprisonment, the case is "unusual" in that it is a not a typical habeas petition brought by an incarcerated individual challenging the validity of a state or federal conviction. In such cases, an individual has been convicted in court after plea or trial, has had a sentence of incarceration imposed by a judge, and has had the opportunity to pursue an appeal. Here, in contrast, Ms. Cardoza was re-imprisoned

based on a single positive test for marijuana with no opportunity to be heard by a neutral decisionmaker about whether imprisonment was warranted given the harm that would result to herself and her family from re-imprisonment. *Cf. S.N.C.*, 2018 WL 6175902, at *6 (noting "Petitioner is not pursuing a routine application to adjust her status").

The unusual circumstances of Ms. Cardoza's imprisonment, coupled with the irreparable harm caused by her separation from her family, justify enlargement pending the resolution of the case.

### B.     Ms. Cardoza Raises Substantial Claims

Ms. Cardoza's Petition-Complaint also raises a substantial claim that BOP has violated her procedural due process rights in re-imprisoning her.

Under the Due Process Clause, before revoking Ms. Cardoza's home confinement, the BOP was required to provide Ms. Cardoza with: (1) written notice of the claimed violations of home confinement and the possibility that she faced re-imprisonment; (2) disclosure of the evidence against her; (3) the opportunity to be heard in person before a neutral and detached decisionmaker and to present witnesses and documentary evidence as to the alleged misconduct and as to whether revocation was warranted should the allegations be established; (4) the right to confront and cross-examine adverse witnesses at the hearing; and (5) a written statement by the decisionmaker as to the evidence relied on and reasons for revoking home confinement. *See Morrissey v. Brewer*, 408 U.S. 471 (1972); *Young v. Harper*, 520 U.S. 143 (1997). Ms. Cardoza also had a due process right to the assistance of her counsel when she faced revocation of home

confinement given manner in which her PTSD and anxiety impair her ability to advocate effectively for herself. *See Gagnon v. Scarpelli*, 411 U.S. 778, 791 (1973).[4]

As this Court has recognized, the U.S. Supreme Court's decisions in *Morrissey* and *Young* provide the framework governing analysis of the due process rights of people on community release who face the possibility of re-imprisonment. *See* Ruling and Order on Respondents' Motion to Dismiss (hereafter "Opinion") at 21 (Dkt. 32). Establishing a liberty interest triggering due process rights depends not only on "the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language" of the Due Process Clause. *Morrissey*, 408 U.S. at 481.

Regarding the "weight" of the interest, *Morrissey* explained that "[w]hether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss." *Id.* (internal quotation marks omitted). This Court has already concluded that Ms. Cardoza adequately alleged that, when her home confinement was revoked, she suffered "grievous loss" and "a substantial deprivation of liberty" that could "warrant due process protections." Opinion at 23.

In determining whether the "nature" of the interest at issue in *Morrissey* triggered due process rights, the Supreme Court stated:

---

[4]       In *Gagnon v. Scarpelli*, 411 U.S. 778, 791 (1973), the Supreme Court held that individuals facing probation or parole revocation must be advised of their limited right to counsel and counsel presumptively should be appointed where requested if the person asserts either: (1) innocence of the alleged misconduct; or (2) the existence of substantial mitigating factors that are difficult to present. In addition, in determining whether counsel should be appointed, authorities must consider the individual's ability to speak on his own behalf. If a request for counsel is denied, the reasons for denial must be explained in the record. The Second Circuit has concluded that the use of counsel as described in *Gagnon* extends to parole rescission hearings as well. *See Drayton v. McCall*, 584 F.2d 1208, 1220 (2d Cir. 1978).

We turn to an examination of the nature of the interest of the parolee in his continued liberty. The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.

We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.

*Morrissey*, 408 U.S. at 481-82 (footnote omitted); *see also Young*, 520 U.S. at 148 (quoting a portion of the above passage, stating "[t]his passage could just as easily have applied to respondent while he was on preparole" and concluding that Oklahoma preparole program was sufficiently similar to parole at issue in *Morrissey* to trigger the same due process protections).

This Court dismissed Ms. Cardoza's Petition-Complaint on the ground that she failed to allege an implicit promise that she would remain on home confinement absent a disciplinary violation. *See* Opinion at 24 ("*Morrissey* and its progeny require the presence of an implicit promise, and there is nothing in Petitioner's allegations regarding her home confinement that suffices, at present.").

Ms. Cardoza's Amended Petition-Complaint contains detailed allegations of such a promise, and attaches evidence supporting these allegations. As set forth in the Amended Petition-Complaint, the implicit promise of remaining on home confinement absent a violation is

derived from an analysis of the statutes and regulations governing home confinement, public communications from BOP leadership, the agreements the BOP requires people to sign when they commence home confinement, the actual practices of the BOP with respect to re-imprisoning people on home confinement, communications from BOP staff to individuals before they commence home confinement, and communications from the Residential Reentry Centers (RRCs) to individuals they are supervising on home confinement.

The purpose of home confinement is to provide a period of time before the end of a person's term in BOP custody when they have support and supervision as they take steps towards successful reintegration into the community. Indeed, the specific statutory purpose of home confinement is to "afford [a] prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." 18 U.S.C. § 3624(c)(1). Section 3624(c) gives the BOP authority to place federal prisoners with "lower risk levels and lower needs" on home confinement for "a portion of the final months of [their] term" and directs that the BOP "shall, to the extent practicable," place eligible prisoners on home confinement "for the maximum amount of time permitted." Although the CARE Act allowed BOP to "lengthen" the home confinement period, that period—however long it may be—is intended to be served during the "final months of [their] term." 18 U.S.C. § 3624(c). Indeed, early in the pandemic, top BOP officials communicated publically to Congress that BOP had begun aggressively screening individuals to be placed on home confinement "for service of the remainder of their sentences."[5]

---

[5]      *See* Ex. 1, Dep't of Justice, Statement of Michael D. Carvajal, Director, and Dr. Jeffrey Allen, Medical Director, Director, Federal Bureau of Prisons Before the U.S. Senate Committee on the Judiciary, at 6
(June 2, 2020) (emphasis added), https://www.judiciary.senate.gov/imo/media/doc/Carvajal-Allen%20Joint%20Testimony.pdf.

The BOP's Program Statement on Home Confinement provides individuals must sign a "Conditions of Home Confinement" form prior to release to home confinement, [6] and compliance with these conditions may be monitored by supervisors electronically or by contact in person or by telephone.[7] The Program Statement requires BOP's CCMs (now called RRMs, or Residential Reentry Management field offices) to ensure a system is in place for handling violations of program rules that meets due process requirements and "includes provisions for dealing with minor infractions of program rules and with major infractions that could result in the inmate's termination from the program."[8]

---

[6]     *See* Ex. 3, BOP Program Statement 7320.01, CN-2, Home Confinement, at 6 (updated Dec. 15, 2017) https://www.bop.gov/policy/progstat/7320_001_CN-2.pdf. Form BP-A0458 appears to be currently-applicable form for people on home confinement. *See* Ex. 4 (also available at and is available at https://www.bop.gov/policy/forms/BP_A0548.pdf). The form is titled "Home Confinement and Community Control Agreement" and begins with a statement that the individual signing "hereby agree[s] to abide by the following Conditions related to my legal participation on home confinement." The form states: "I am aware that I will legally remain in the custody of the Bureau of Prisons and/or the U.S. Attorney General and that failure to remain at the required locations may result in disciplinary action and/or prosecution for escape"; "I agree to report to my assigned probation officer or the contractor's facility immediately upon reaching my release destination"; "I understand that if I decline to participate in the recommended home confinement program I may face administrative reassignment out of the community corrections program"; "I agree that during the home confinement period, I will remain at my place of residence, except for employment, unless I am given permission to do otherwise"; "I also understand that I will be required to pay the costs of the program based on my ability to pay"; "I also agree to maintain a telephone at my place of residence without 'call forwarding', a modem, 'Caller ID' or portable cordless telephones for this period"; and "I also agree that, if my confinement is to be electronically monitored,I will wear any electronic monitoring device required, following procedures specified and will not have 'call forwarding' on my telephone.").

[7]     *Id.* at 6.

[8]     *Id.* at 6. Another statutory provision, 18 U.S.C. § 3624(g)(5), applicable at least to individuals on prelease custody (i.e., home confinement or RRC placement) under the First Step Act, shows further the home confinement program's concern with violations. *See id.* § 3624(g)(5) ("Violations of conditions.—If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines

An implicit promise of remaining on home confinement absent a violation has been

created by the statutory framework governing home confinement along, the Program Statement's

assurances of due process protections prior to termination from the home confinement program,

and the BOP Director's statement that individuals released on home confinement during the

pandemic would be home for the remainder of the sentence.

The actual operation of the home confinement program and BOP practices with respect to

revocation since the CARES Act was enacted in March 2020 provide further evidence of the

implicit promise that people will stay on home confinement absent violation and the reasonable

expectation people have of staying home absent misconduct. On December 10, 2021, BOP

General Counsel Hyle described the operation of the home confinement program under the

CARES Act. He explained, as is set forth in the Program Statement, that before being placed on

home confinement, an individual "signs an agreement which requires consent to submit to home

visits and drug and alcohol testing, acknowledgement of monitoring requirements, and

affirmation that he or she will not engage in criminal behavior or possess firearms, among other

terms."[9] Through supervisors, "individuals placed on home confinement are monitored

electronically; have check-in requirements; and are subject to alcohol and drug testing and

transfer back to secure correctional facilities if there are any significant disciplinary infractions

---

appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the
remainder of the term of imprisonment to which the prisoner was sentenced, or any portion
thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons
shall revoke the prisoner's prerelease custody.").

[9]      Ex. 2, Memorandum for Christopher H. Schroeder, Assistant Attorney General, Office of
Legal Counsel, from Kenneth Hyle, General Counsel, BOP, Re: Views Regarding OLC Opinion,
"Home Confinement of Federal Prisoners After the COVID-19 Emergency," at 5 (Dec. 10,
2021), ("General Counsel Memo"),
https://www.aclu.org/sites/default/files/field_document/bop_cares_memo_12.10.21.pdf.

or violations of the agreement."[10] He underscored: "Under regular circumstances, inmates who have made this transition to home confinement would not be returned to a secured facility, unless there was a disciplinary reason for doing so, as the benefit of home confinement is to adjust to life back in the community, and therefore removal from the community would obviously frustrate that goal."[11] Thus, as communicated by BOP's General Counsel, the BOP does not have a practice of sending people on home confinement back to prison absent a disciplinary reason as this would undermine the reentry-support purpose of the home confinement program.

Accordingly, BOP's policies and practices, as well as its governing statutes and statements from its leadership, have communicated an implicit promise that individuals will not be returned to prison absent a major infraction. As with the parole system at issue in *Morrissey*, implicit in the home confinement program's concern with violations of the rules of home confinement is the notion that people on home confinement are entitled to retain their liberty as long as they substantially abide by the conditions of the home confinement program. *See Morrissey*, 408 U.S. at 479. As with parole, the essence of home confinement is release from prison, before the completion of sentence, on the condition that the individual abide by certain rules during the balance of the sentence. *Id.* at 477.[12] Individuals on home confinement have

---

[10]     *Id.*

[11]     *Id.* at 5.

[12]     Notably, as this Court observed, the Supreme Court "found an indication of an implicit promise that a parolee could remain at home absent a violation of her conditions even though the statute governing the parole program at issue provided complete discretion to the warden to revoke parole at any time." Opinion at 16 (quoting Justice Douglas' dissent in *Morrissey*, which in turn quoted Iowa statute providing that parolees "shall be subject, at any time, to be taken into custody and returned to the institution from which they were paroled").

    This Court has also correctly rejected the government's contention that the implicit promise/reasonable expectation of staying home absent a violation must be derived from an

relied on this implicit promise and reasonably expect to remain on home confinement absent

major infractions. *See Tompkins v. Pullen*, No. 3:22-CV-00339 (OAW), 2022 WL 3212368, at

*11 (D. Conn. Aug. 9, 2022) (concluding that "even if Petitioner's reasonable expectations were

dispositive, there is ample evidence from which to conclude that Petitioner did have a reasonable

expectation that she would remain on home confinement absent misbehavior" referencing, *inter*

*alia*, the statements of Director Carvajal and General Counsel Hyle, the fact that as "the express

purpose of § 3624(c) is reintegration into society, one might reasonably expect that the BOP

would not thwart such efforts absent good reason," and "as in *Young*, it appears that Petitioner

never was informed that she could be removed from home confinement absent cause, thereby

reasonably creating the implicit belief that she would not be remanded without reason").

Here, not only do BOP's governing statutes, policies, procedures, and communications

from leadership create an implicit promise of remaining on home confinement absent a violation,

but such a promise was explicitly provided through direct communication from staff at FCI

Danbury to Ms. Cardoza and other individuals at the Camp in the early months of the pandemic.

After Ms. Cardoza was approved for home confinement, BOP staff said: "You'll do your

time there." They said: "Congratulations" and "don't do anything that will bring you back." Ex.

5, Cardoza Decl. ¶ 4. BOP staff assured Ms. Cardoza and other women approved for home

---

explicit entitlement to this treatment created by regulation or statute. *See* Opinion at 23 ("There
are therefore several possible sources for the promise, and the Court cannot hold—as
Respondents have proposed—that an implicit promise of continued liberty must be
communicated expressly via a statute or regulation. Imposing such a requirement would be more
akin to requiring an explicit promise, as opposed to an implicit one."); *see also Kim v. Hurston*,
182 F.3d 113, 117 (2d Cir. 1999) (stating that "[i]n *Sandin*, the [Supreme] Court abandoned
reliance on the extent to which state regulations narrowed prison officials' discretion as a test for
a prisoner's protected liberty interest"); *Morrissey*, 408 U.S. at 481 (noting that the Supreme
Court "has rejected the concept that constitutional rights turn upon whether a governmental
benefit is characterized as a 'right' or as a 'privilege'").

confinement that they would be brought back to prison only if they violated the rules of the home confinement program. *Id.* ¶ 3; *see also* Ex. 6, Maurya Decl. ¶ 5. Some of the women, like Ms. Cardoza, had substantial time left on their sentences. Everyone was thankful that they were being allowed to serve the rest of their sentences at home and viewed this as "a blessing." Ex. 5, Cardoza Decl. ¶ 5.

Indeed, in both April and May 2020, BOP staff held Town Hall meetings at the Camp where release to home confinement was discussed. At the time, no one knew how long the pandemic would last. When women expressed concern about being brought back to prison when the pandemic ended, staff assured them that the only way they would be brought back is if they committed misconduct. Ex. 7, Phillips Decl. ¶¶ 5-8. They said: "The only way you are coming back is if you put yourself here." *Id.* Accordingly, Ms. Cardoza understood from communications with staff that she would remain on home confinement unless she violated a rule of the home confinement program. Ex. 5, Cardoza Decl. ¶ 7. Ms. Cardoza relied on this promise and reasonable expectation when she reestablished a close relationship with her daughter, become engaged to her fiancé, and became a mother to his children. *Id.*

Although individuals on home confinement remain technically in BOP custody, they are allowed to live at home with their families, seek and maintain employment, pursue educational opportunities, participate in treatment programs, attend religious services, and engage in various other activities in their communities. Thus, in addition to establishing an implicit (and even explicit) promise, Ms. Cardoza has also demonstrated that the other features of the home confinement program mirror the parole, prepare, and work release programs at issue in *Morrissey* and *Young* where the Supreme Court held that the "nature" of the interest triggered due process protections. *See Morrissey*, 408 U.S. at 481-82 ("Subject to the conditions of his

parole, he can be gainfully employed and is free to be with family and friends and to form the

other enduring attachments of normal life."); *Young*, 520 U.S. at 148 ("In compliance with state

procedures, he was released from prison before the expiration of his sentence. He kept his own

residence; he sought, obtained, and maintained a job; and he lived a life generally free of the

incidents of imprisonment. To be sure, respondent's liberty was not unlimited. He was not

permitted to use alcohol, to incur other than educational debt, or to travel outside the county

without permission. And he was required to report regularly to a parole officer. The liberty of a

parolee is similarly limited, but that did not in *Morrissey* render such liberty beyond procedural

protection.") (citations omitted); *see also Kim*, 182 F.3d at 118 (holding that individual in work

release program in the custody of the New York Department of Correctional Services had a

liberty interest triggering due process protections where the "work release program in which Kim

participated, at least the final phase in which she lived at home and worked at a job, while

regularly reporting to Parkside, is virtually indistinguishable from either traditional parole or the

Oklahoma program considered in *Young*").

      Accordingly, Ms. Cardoza has established that the nature of her interest in remaining on

home confinement is one within the meaning of the Due Process Clause. The termination of her

home confinement is a grievous loss triggering the procedural protections of *Morrissey* and

*Young*.

      Here, before revoking home confinement based on a single positive test for marijuana,

the BOP provided no opportunity whatsoever for Ms. Cardoza to appear in front of the person or

group of people making the home confinement revocation decision. Contrary to the requirements

of *Morrissey* and *Young*, Ms. Cardoza had no ability to present and confront evidence at a

hearing in front of a neutral and detached decisionmaker regarding the allegations against her

and whether, even if the allegations were established, why re-imprisonment was not an appropriate sanction. *See Morrissey*, 408 U.S. at 488 (holding that the individual "must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation"). Nor did Ms. Cardoza have the assistance of counsel, as *Gagnon* required given her medical impairments.

Instead, Ms. Cardoza was summoned to the Bronx Community Reentry Center, her designated halfway house run by GEO Group, Inc., which contracts with BOP to provide supervision to individuals placed on home confinement in the area. There, about an hour after receiving an incident report alleging marijuana use, she met with GEO Group staff members, who had no decisionmaking authority, who did not provide her with the evidence underlying her charge, who failed to provide access to counsel at the meeting, and who did not inform her that she faced the possibility of returning to prison. Ex. 5, Cardoza Decl. ¶¶ 20-28.

Indeed, it appears that Ms. Cardoza's fate was sealed by Patrick McFarland, a BOP Residential Reentry Manager, who indicated Ms. Cardoza would be re-imprisoned based on a conclusory email he received from the RRC and before any investigation of the allegation and mitigating circumstances had been conducted. *See* Ex. 9, McFarland Email Exchange (instructing GEO Group staff to "conduct investigation and cdc" and "once sent to the dho we will send remand and you can pull the inmate in house from home detention to be remanded"). It does not appear that BOP revisited Mr. McFarland's home confinement revocation decision, and Ms. Cardoza never had the opportunity to appear in front of Mr. McFarland or any BOP decisionmaker. To date, BOP has not has not given Ms. Cardoza a written explanation (or any explanation) of the reasons for revocation and the evidence relied upon, as *Morrissey* requires. Ex. Cardoza Decl. ¶¶ 27-28.

Such conduct by BOP plainly violated Ms. Cardoza's procedural due process rights and entitles her release home until a hearing that complies with due process requirements is provided.

## II.      This Court Should Grant Ms. Cardoza's Enlargement Request

For the reasons described above, this Court should grant Ms. Cardoza's enlargement request and allow her to return to home to care for her children, her fiancé, and her mother, and obtain medical care for her worsening seizures. Ms. Cardoza respectfully requests that the Court enter the enlargement order forthwith.

Respectfully submitted,

EVA CARDOZA

Dated:  August 16, 2022            By:      */s/  Sarah F. Russell*
Sarah F. Russell, ct26604
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
Telephone: (203) 582-5258
Email: sarah.russell@quinnipiac.edu