# EXHIBIT 1



# Department of Justice

STATEMENT OF

MICHAEL D. CARVAJAL
DIRECTOR
AND
DR. JEFFERY ALLEN
MEDICAL DIRECTOR
FEDERAL BUREAU OF PRISONS

BEFORE THE

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE

FOR A HEARING ON
EXAMINING BEST PRACTICES FOR INCARCERATION
AND DETENTION DURING COVID-19

PRESENTED
JUNE 2, 2020

**Statement of Michael D. Carvajal**
**Director, Federal Bureau of Prisons**
**And**
**Dr. Jeffery Allen**
**Medical Director, Federal Bureau of Prisons**
**Before the Committee on the Judiciary**
**United States Senate**
**June 2, 2020**

   Good morning, Chairman Graham, Ranking Member Feinstein, and Members of the Committee.  You have asked me to come before you today to discuss the Bureau of Prisons' (Bureau's) mission and operations in response to the COVID-19 pandemic that is impacting our country, and indeed, the world.  The Bureau's response and management of COVID has received a great deal of Congressional, media, and stakeholder interest and scrutiny in the wake of this pandemic.  Much of this inquiry has been based on misinformation as to our response.  We appreciate this opportunity to discuss in person all that we have been doing to reduce risks and mitigate the impacts of the pandemic, and to keep our staff, inmates, and communities safe.

   I was honored to be selected by Attorney General Barr to lead the Bureau and to work alongside the finest corrections professionals in the world.  I have spent 28 years in the Bureau, starting as a Correctional Officer, moving up through the ranks of Correctional Services to become a Warden, Regional Director, and now Director.  I was appointed to serve as the Bureau's eleventh Director on February 25, 2020, just about four weeks before the Bureau's first inmate COVID-19 positive case.  In these past three months, I have seen the Bureau's over 36,000 corrections professionals work tirelessly and with profound dedication toward their mission to protect the health and safety of inmates, fellow staff and the public.  I am keenly aware of the personal sacrifices these law enforcement officers make in fulfilling our important public safety mission.  The great work they do every day goes largely unseen by the general public.  Yet this inherently dangerous work helps keep our communities safe.  Many communities have been very supportive and appreciative of the difficult challenges our law enforcement personnel face and overcome even in the absence of this public health crisis.  Some communities support and applaud our staff as frontline heroes, and other communities have treated these brave staff and fellow citizens in a far less courteous manner, sometimes even accusatory or hostile.  Those latter reactions, albeit rare, are disappointing, and unwarranted.

   The Bureau has a sound pandemic plan in place and a well-established history of managing and responding to communicable disease outbreaks, such as influenza.  We used this pandemic plan as a springboard for our COVID-19 response planning beginning in January, when our medical leadership began consulting with relevant experts, including the Centers for Disease Control and Prevention (CDC), the U.S. Public Health Service, the Office of Personnel Management (OPM), and the Office of the Vice President.  We leveraged and implemented guidance from these experts and used it in developing protocols for screening inmates and staff with potential exposure risk factors.  We have continued this strong collaboration, with our Medical Director and staff consulting on an almost daily basis with the CDC to ensure we are implementing best practices based on science and sound judgment, as the knowledge about and

response to the pandemic continues to evolve.  We have invited the CDC into our facilities and had them evaluate our work, which has been met with praise for our planning and implementation in the wake of a very vexing virus.  We continue to collaborate with the CDC in providing information to assist them in developing additional guidance for corrections professionals nationwide.

In order to be transparent about our plans, operations, and statistics, the Bureau has put together a detailed and thorough COVID-19 pandemic resource area on our public website at www.bop.gov/coronavirus.  The website is updated daily at 3 pm with our latest information as reported by the BOP's Office of Occupational Health and Safety.  In addition, the Bureau provides a weekly telephonic briefing for staff from the United States Senate and U.S. House of Representatives Judiciary and Appropriations Committees.

## CURRENT STATUS

The Bureau manages the health and treatment of approximately 149,000 inmates in BOP facilities and RRCs.  Over half of our institutions have no COVID-19 positive cases among inmates or staff.  Indeed, two-thirds of our positive cases are in just 7 of our 122 institutions nationwide.  As of June 1, 2020, across all facilities, there are 1,650 federal inmates who are currently COVID-19 positive based on test results. There are also currently 171 Bureau staff who have confirmed positive test results for COVID-19 nationwide, with 445 staff recovered and returning to work.

In total, from March 1, 2020, the date of the beginning of the national emergency proclaimed by President Trump, until today, 5,323 inmates total have tested positive for COVID-19 and to-date, 3,784 have recovered.  More than 80 percent of infected individuals have not become significantly ill.  The number of hospitalized inmates – those who became significantly ill – is currently only 83 in total.  And in fact, the number hospitalized is on a significant downward trajectory (see attached), suggesting that our attempts to mitigate the transmission of the virus is effective.  Regrettably, there have been 68 federal inmate deaths from COVID-19.

To-date, the Bureau's overall infection rate is approximately 4%, including clinically-probable and suspect cases, and based on the total number of inmates in custody.  The BOP's death rate of those infected is approximately 1.1% and is slightly lower than the US rate of 1.3%.  The BOP's rate of hospitalization has continued to decline over time with only 83 inmates currently hospitalized and only 22 of those on ventilators.

## PANDEMIC PLANNING

In response to the COVID-19 pandemic, the Bureau has taken, and will continue to take, aggressive steps to protect the safety and security of all staff and inmates, as well as members of the public.  Using the Incident Command System (ICS) framework, the Bureau developed, implemented, and updated an incident action plan that addresses our modified institution operations, Continuity of Operations Program, information technology readiness, supply management, inmate movement, inmate visitation, and official staff travel, as well as other important aspects of our operations.  In addition to the modifications we have already

undertaken, we continue to find innovative ways to continue to provide inmate programming to assist them with reentry.

The Bureau has also provided on an on-going basis detailed information about COVID-19 based on CDC guidance to inmates and staff on symptoms, transmission, preventative measures, and importance of reporting any potential symptoms to Health Services staff.  We have an internal web-based system for tracking and monitoring infectious diseases and outbreaks, which leverages data from Bureau operational systems and facilitates the management of active cases for health care and correctional professionals system-wide.  In all of our guidance, one simple preventative measure we have stressed is practicing good hygiene, as basic hygiene practices can be very effective in reducing the spread of germs.  In addition, despite random reports of shortages, all institutions have ample cleaning products, disinfectant, and soap available and may procure additional supplies from a regional or national stockpile.

## PERSONAL PROTECTIVE EQUIPMENT

Initially, the Bureau was facing the same personal protective equipment (PPE) supply chain challenges as the rest of the country.  We had appropriate amounts of PPE in our inventories, but we were concerned we would not be able to obtain additional needed supplies going forward as existing inventories dwindled.  However, through scouring of available markets and use of emergency purchasing authorities, the Bureau successfully acquired a sizable stockpile of PPE.  Each institution maintains a detailed inventory of PPE which is also monitored by our Emergency Operations Center in headquarters, to include N95 respirators, surgical masks, cloth face coverings, goggles/face shields, gloves, gowns, hand sanitizer, and cleaning supplies.  In addition, each of our six regions maintains a regional stockpile, where items can be drop-shipped in one day to an institution that needs additional PPE.  Note that initial CDC guidance was that face coverings were not recommended as a general measure.  As the science evolved as to how the disease is transmitted, the CDC changed their guidance to recommend wearing face coverings.  Within 24 hours of that change, we had provided face coverings to most of our staff and inmates.  Within 72 hours, all of our inmates and staff were provided face coverings.  To further augment our supplies, and consistent with the request of some congressional members, 15 Federal Prison Industries (FPI) factories were converted to PPE production for cloth face coverings, gowns, face shields, and hand sanitizer, allowing us to be more self-sustaining in production areas rather than burdening the public supply chain.

## INSTITUTION OPERATIONS

On March 13, 2020, in response to an increasing number of people with COVID-19 positive infections in various communities, the Bureau implemented an action plan to significantly limit movement in and out of our federal prisons.  Almost all inmate internal ─ or Bureau-controlled ─ movement was suspended.  There was some very limited inmate movement that was required, to include movements for forensic studies, writs, Interstate Agreements on Detainers, medical and mental health treatment, and transfer to RRCs or home confinement.  New admissions to the Bureau from the USMS continued, as legally required.  While we received criticism for that continued movement, it is critical to note that the criminal justice system did not stop processing criminal cases during the pandemic.  Individuals in the community continue to commit crimes, arrests continue to be made, federal courts continue to

adjudicate and sentence offenders, and thus detainees and sentenced inmates continue to enter our system. We are legally required to take these individuals from the Courts, and cannot control who the courts place into our system. Some of these inmates are housed in Bureau detention facilities and jail units prior to sentencing, but the vast majority of them come to us from local jails or as voluntary surrenders. Working with the Department of Justice, we attempted to slow the entrance of some of these new admissions until additional testing capability was acquired.

As a critical part of our plan to mitigate the transmission of COVID-19 throughout its facilities nationwide, the Bureau, in coordination with the U.S. Marshals Service (USMS), has decreased internal movement by 90%. This action, along with the Bureau's implementation of a robust quarantine and isolation strategy for all new arrivals, was a bold and important short-term step to ensure the Department of Justice is protecting the health of the public, the staff, and the inmates in our custody to the greatest extent possible.

With the March 13 guidance, we also put in place, to the greatest extent possible within the prison environment, social distancing procedures. As is widely noted, prisons are not designed for social distancing. In fact, they are designed for just the opposite. Nonetheless, we modified our operations to the extent we could to minimize co-mingling and group gathering. We suspended social visiting as well, to decrease the flow of individuals from the community into the prison. Understanding the importance of visitation to the inmate population, we significantly increased telephone minutes for the inmates from 200 to 500 minutes on March 13, 2020, and later, on April 8, 2020, in accordance with the CARES Act, we made telephone calls free for the inmate population. We also made video-visiting, which we have available at our female facilities, free of charge. The free telephone calls were clearly appreciated by the inmate population, as telephone minutes increased by nearly 50% the next day. We are currently finalizing a regulation to formalize this program.

On March 26, 2020, we implemented enhanced daily monitoring, to include the cessation of movement for any inmate who screened positive for COVID-19. On March 31, 2020, enhanced modified operations were introduced to further limit movement within the institution and enable maximizing social distancing while still allowing inmates access to critical resources, to include eating meals in their rooms or cells or in small groups within housing units, and limiting programmatic offerings to individualized or small group activities, and having Chaplains and Psychologists visit inmates in their housing areas. We instituted requirements on April 7, 2020 for all inmates releasing from the Bureau or transferring to a RRC or Home Confinement to be placed on 14-day quarantine prior to their anticipated release or transfer. These procedures remain in place to promote public safety.

As I noted above, throughout this pandemic the federal courts have continued to remand pre-trial detainees to federal custody nationwide and to sentence inmates who are in our detention sites to terms of federal incarceration. As individuals continue to be remanded to Bureau detention sites, that capacity quickly fills. To ensure those facilities do not become dangerously overcrowded – a situation that is not only a health risk but also creates safety and security risks - some limited inmate movement must continue. As such, the Bureau and USMS will have to resume limited movement of inmates in order to appropriately manage the population within detention facilities to reduce risk. Since ceasing most movement, there have

been 6,800 USMS inmates in state and local jails that require movement into the Bureau and another 7,000 inmates currently in Bureau custody who are pending regular movement to their designated facilities.

Effective May 18, 2020, the Bureau and the USMS began coordinating carefully to transport and transfer federal inmates into the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into our environment.  The Bureau is testing all inmates upon arrival to our detention facilities, jail units, and quarantine/testing sites.  Furthermore, all inmates are tested prior to departing these facilities to ensure inmates are safely transported to their designated facilities.  As a second precaution, the Bureau will temporarily house all incoming inmates in one of three quarantine sites: FCC Yazoo City, Mississippi; FCC Victorville, California; and Federal Transfer Center, Oklahoma City, Oklahoma.  These inmates are tested again before moving to their final Bureau designated facility.

Further, regardless of COVID-19 planning and protocol, emergencies have and will continue to arise that require us to adapt changes to our procedures.  For example, in the midst of the diligent work Bureau staff were undertaking nationwide to counter the pandemic, on April 13, 2020, Federal Correctional Institution (FCI) Estill, South Carolina was struck by a tornado causing extensive damage to both the medium and minimum security institutions.  Despite the damage to the facilities, only five inmates sustained very minor injuries.  Over the ensuing four days, we were able to safely and securely move 842 inmates, relocating them to a prison in Pennsylvania that had available capacity.  We have plans in place to deal with situations such as these, and even with the complexities that the COVID-19 pandemic adds to the execution of those plans, the experience of FCI Estill on April 13 reflects just how well-trained and prepared our staff and leadership are to handle whatever the next crisis may be.

## HOME CONFINEMENT

As the pandemic grew more widespread, the Bureau began aggressively screening the inmate population for inmates who were appropriate for transfer to RRC or Home Confinement for service of the remainder of their sentences.  On March 26, 2020 and April 3, 2020, Attorney General Barr issued memoranda to the Bureau directing us to increase the use of Home Confinement, particularly at institutions that were markedly affected by COVID-19, for vulnerable inmates.  The CARES Act, signed by President Trump on March 27, 2020, further expanded our ability to place inmates on Home Confinement by lifting the statutory limitations contained in Title 18 U.S.C. § 3624(c)(2) during the course of the pandemic.  I am pleased to note that we currently have 6,120 inmates in RRC and 6,398 on Home Confinement. This is an 124% increase in HC from March 26, 2020.   There are an additional 985 who are scheduled to transfer to Home Confinement in the coming weeks.  While we continue to make robust strides in these placements to reduce risk of spread to the inmate population and staff, public health and safety must remain our highest priority.  The Attorney General has issued guidance as to which inmates should be considered for home confinement.  Staff are conducting individualized assessments to ensure inmates are appropriate for community placement both from a public safety perspective and given their own specific needs and circumstances.  Additionally, we must ensure inmates who release to Home Confinement have a viable residence in which to reside.

It should go without saying that while we are dedicated to the protection of our inmates' health and safety, we also have to consider—as the Attorney General's guidance emphasized—that inmates who presented a risk of public safety because of their criminal acts or other factors cannot be released. Neither can we release inmates who would be worse off outside Bureau facilities than inside, such as those whose medical conditions could not be adequately cared for by health systems that are themselves overwhelmed by the response to COVID infections in the general community. Nor can we release inmates who do not have safe housing for themselves or housing that is not subject to appropriate safeguards for home confinement, which is still, after all, a form of incarceration for persons convicted of crimes whereby such persons are still serving a federal sentence.

## CONCLUSION

I am honored to speak on behalf of the Bureau, the staff in our 122 institutions, and our administrative offices nationwide. Our mission is extremely challenging, but critical to the safety and security of the public, our staff, and the inmates we house. I thank the staff who, like first responders everywhere, are working long hours to mitigate the spread of COVID-19 in our facilities. The Bureau can be proud of this hard work, but we understand there is still more to do.

Chairman Graham, Ranking Member Feinstein, and Members of the Committee, this concludes my formal statement.

