# EXHIBIT 2



U.S. Department of Justice

Federal Bureau of Prisons

_____

Office of the General Counsel                                       Washington, DC 20534

December 10, 2021

MEMORANDUM FOR CHRISTOPHER H. SCHROEDER
                              Assistant Attorney General, Office of Legal Counsel

FROM:      Ken Hyle
              Assistant Director/General Counsel

SUBJECT:  Views Regarding OLC Opinion, "Home Confinement of Federal Prisoners
              After the COVID-19 Emergency" dated January 15, 2021

**Introduction**

Traditionally the Federal Bureau of Prisons (BOP or Bureau) placed inmates on home confinement as part of reentry programming, consistent with 18 U.S.C. § 3624(c)(2)[1], and other recent authorities relevant to certain elderly offenders. However, in response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). The statute expanded the Bureau's authority to place potentially all inmates on home confinement in response to the COVID 19 pandemic.

Specifically, the CARES Act states, "During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of Title 18, United States Code, as the Director determines appropriate." <u>See</u> Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020).

The term "covered emergency period" means the period beginning on the date on which the President declared a national emergency under the National Emergencies Act (50 U.S.C. § 1601

---

[1] Providing, as amended by the FIRST STEP Act of 2018, "The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph."

et seq.) with respect to the Coronavirus Disease 2019 (COVID-19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates. Id.

On January 15, 2021, the Office of Legal Counsel (OLC) issued an opinion to the BOP, stating that the CARES Act authorizes the Director of BOP to place prisoners in home confinement only during the statute's covered emergency period and when the Attorney General finds that the emergency conditions are materially affecting BOP's functioning.  OLC determined that once the expanded authority to place inmates in home confinement under § 12003(b)(2) expires, so too does the authority to keep those inmates in home confinement unless they are otherwise eligible for home confinement under 18 U.S.C. § 3624(c)(2).  OLC also concluded that the general imprisonment authorities of 18 U.S.C. § 3621(a) and (b) do not supplement the CARES Act authority to authorize home confinement under the Act beyond the limits of section 3624(c)(2).[2]

OLC has informed us that the Attorney General has requested that OLC reconsider its earlier opinion, and as part of that process, OLC has asked for our views.  As described below, BOP believes the language and legislative history of the CARES Act are most reasonably interpreted not to require the return of inmates placed on home confinement pursuant to the expanded authority it provided.  This is consistent with the position that BOP had taken in relation to the earlier OLC opinion.  As such, we recommend that OLC's earlier opinion be rescinded and that it write a new opinion providing the BOP with discretion to allow inmates placed on home confinement pursuant to the CARES Act to remain on home confinement after the expiration of the covered emergency period.

**Statutory Authority**

The CARES Act, as quoted above, is silent as to any necessary result at the end of the covered emergency period.  Given this ambiguity, we believe it is the better reading, as well as more consistent with the statutory language and Congressional intent of the CARES Act and the existing statutory authorities of the BOP, to allow the BOP discretion in determining the conditions of confinement during the service of a criminal sentence after the emergency period is over.

A common misconception concerning home confinement is that inmates are "released" from custody.  While it is true that such inmates are transferred from correctional facilities and placed in the community, they are still serving a sentence which is administered by the BOP.  Section 3621(a) of Title 18 clearly states that inmates serving a term of imprisonment, ". . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed . . ." The statute goes on to specify that the Bureau has the discretion to designate the place of imprisonment, considering a number of factors.  Further, the Bureau's designation decisions are not reviewable by any court.  See 18 U.S.C.  § 3621(b).

---

[2]Home Confinement of Federal Prisoners After the COVID-19 Emergency, 45 Op. O.L.C. __ (January 15, 2021), available at https://www.justice.gov/olc/file/1355886/download.

Statutory language specifically addressing home confinement makes it clear such placements are at the discretion of the BOP (e.g. ". . .may be used . . .", ". . .to the extent practicable. . .") See 18 U.S.C. § 3624(c)(2). Although Congress set out general limitations to home confinement authority in § 3624, it also recognized that the BOP's general designation authority takes precedence. See 18 U.S.C. § 3624(c)(4) ("Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621.").

The CARES Act gives the BOP Director the authority to lengthen the home confinement timeframe in § 3624(c)(2) for a specific prisoner. Nothing in section 12003(b)(2), or any other provision of the CARES Act, discusses rescinding that determination and reverting to the 18 U.S.C. § 3624(c)(2) standard timeframe for home confinement once the "covered emergency period" has concluded. Instead, "during the covered emergency period" refers to the timing of the <u>decision</u> lengthening the home confinement period, not its ultimate outcome (remaining on home confinement or returning to a BOP facility). Once a decision has been made to "lengthen" a particular inmate's home confinement term, no further action (i.e., bringing the inmate back into secure custody from home confinement) is compelled or contemplated by the statute.

Further, given the context surrounding recent Congressional adjustments to community placements and home confinement designations described below, an interpretation of the statute reading BOP's discretion to determine the conditions of confinement necessary for service of a criminal sentence more broadly is more consistent with apparent Congressional intent than the narrow reading prescribed by the January 15, 2021 OLC opinion.

**Additional Congressional Intent**

Although the CARES Act was passed, in relevant part, to mitigate the impact of COVID-19 on specific inmates who would otherwise be confined in a traditional correctional setting, Congress recently passed other legislation supporting maximizing the use of home confinement and placing inmates on home confinement for longer periods of time than has been traditionally used and beyond the prior time frames of 18 U.S.C. § 3624(c)(2). The First Step Act of 2018, Pub.L. 115-391 (2018) (FSA), expanded the Bureau's use of home confinement in three contexts.

Section 602 of the FSA, which modified 18 U.S.C. § 3624(c)(2), left the existing time frames in place, but directed the Bureau to maximize the amount of time spent on home confinement when possible.[3]

Section 603(a) of the FSA reauthorized and modified the pilot program provided for by the Second Chance Act, Pub.L. 110-199 (2008), codified in relevant part at 34 U.S.C. § 60541, to determine the effectiveness of removing eligible elderly offenders from Bureau facilities and placing such offenders on home confinement. In order to be eligible for the pilot, an offender has to be 60 years old, serve at least 2/3 of the sentence imposed, and not have a disqualifying conviction, among other criteria. The new FSA criteria expanded the pilot by lowering the age

---

[3] "The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the *maximum amount of time* permitted under this paragraph." <u>Id.</u> (emphasis supplied).

from the original requirement of being 65 years old, reducing the sentence criteria from the original percentage to the greater of 10 years or 75 percent of the sentence imposed, and allowing for its application to terminally ill and/or debilitated inmates regardless of age. Eligible inmates can be placed on home confinement without regard to the timeframes of 18 U.S.C. § 3624(c)(2).[4]

Finally, section 101 of the FSA created an incentive for eligible inmates to participate in programs shown to reduce their risk of recidivism, by allowing individuals to earn time credits which may be used for earlier transfer to pre-release custody, including home confinement, again without regard for the timeframes of 18 U.S.C. § 3624(c)(2). See 18 U.S.C. § 3624(g). The statute provides that an inmate who is placed in home confinement "shall remain in home confinement until the [inmate] has served not less than 85 percent of the prisoner's imposed term of imprisonment," and that the BOP should provide increasingly less restrictive conditions on inmates who demonstrate continued compliance with the conditions of such prerelease custody. See 18 U.S.C. §§ 3624(g)(2)(A)(iv), (g)(4).

Again, although the CARES Act was passed under differing circumstances, the above legislative activity reflects a clear indication of recent Congressional intent to expand the use of home confinement based on the needs of the offender. As explained further below, the ambiguity in the CARES Act should be read, in part, with the impact on individual offenders and penological need in mind.

**Operational Concerns**

One of the vital tools in operating a correctional system is the ability to effectively manage bedspace, based on the needs of the offender, security requirements, and agency resources. Courts have recognized that the authority explicitly provided to the Bureau by 18 U.S.C. §§ 3621 (a) and (b) to designate inmates is in the agency's sole discretion, supporting this management principle. See e.g., U.S. v. Wilson, 503 U.S. 329, 335 (1992); Rodriguez v. Copenhaver, 823 F.3d 1238, 1242 (9th Cir. 2016). Being able to control populations in BOP-operated institutions as well as, where appropriate, in the community allows for flexibility to respond to circumstances as varied as an increase in prosecutions, responses to local or national emergencies or natural disasters, or the need to provide assistance to the U.S. Marshals Service following, for example, limitations placed on the use of private detention facilities. Although the BOP could accommodate bringing CARES Act inmates back into its correctional facilities, having some discretion in determining which inmates should return to BOP's secure custody will increase the agency's ability to respond to outside circumstances, and manage its resources in an efficient manner that considers both public safety and the needs of the individual offender.

The aspects of a criminal sentence that serve public safety concerns can be managed while also allowing an individual to effectively prepare for life when a criminal sentence is concluded. Inmates that were placed on home confinement under the CARES Act were evaluated by BOP case management staff using criteria provided by the Attorney General which included among

---

[4] See BOP Operations Memorandum 001-2021, Home Confinement under the First Step Act, available at https://www.bop.gov/policy/om/001-2021.pdf

other factors criminal history and institution adjustment determinations, received a higher level review by headquarters staff in some cases, and were treated consistent with COVID-19 protocols in effect at that time before release (e.g. a 14 day quarantine period for unvaccinated inmates). Before being placed on home confinement, an inmate signs an agreement which requires consent to submit to home visits and drug and alcohol testing, acknowledgement of monitoring requirements, and affirmation that he or she will not engage in criminal behavior or possess firearms, among other terms. Through the use of independent contractors, or, less frequently, the U.S. Probation Office, individuals placed on home confinement are monitored electronically; have check-in requirements; and are subject to alcohol and drug testing and transfer back to secure correctional facilities if there are any significant disciplinary infractions or violations of the agreement. CARES Act inmates that would remain on home confinement after the emergency period would continue to be subject to these monitoring procedures until the end of their sentence, and possibly into a term of supervised release post-sentence.

As seen by the passage of the FSA and other ongoing criminal justice initiatives, the use of incarceration is being re-evaluated as compared to the societal benefits of non-custodial rehabilitative programs. The benefits to home confinement from a penological standpoint is as one of the last steps of a reentry program. An inmate would usually be moved over the course of the sentence to less secure conditions of confinement (i.e. a secure prison facility, to a residential reentry center, to home confinement), to provide transition back into the community with support, resources, and supervision from the agency. Under regular circumstances, inmates who have made this transition to home confinement would not be returned to a secured facility, unless there was a disciplinary reason for doing so, as the benefit of home confinement is to adjust to life back in the community, and therefore removal from the community would obviously frustrate that goal. The widespread return of prisoners without a disciplinary reason would be unprecedented.

Of course, placements made under the CARES Act are not simply for reentry purposes; rather, they are also to allow for more social distancing in our facilities and protection of particularly vulnerable offenders. However, the best use of agency resources and best outcome for the affected offenders is to allow the agency to assess CARES Act placement inmates with a reentry focus. Allowing the BOP to have discretion in terms of returning inmates who have been successfully serving their sentences in the community to secure custody will allow a determination of whether there is actual penological reason for doing so, rather than make the kind of "all or nothing" determination made under the previous OLC opinion.

Individualized assessments allow the needs of the offender to be taken into account and evaluated to determine if it would be more beneficial to return the inmate to a secure facility for programming and treatment only offered in BOP facilities (e.g. Residential Drug Treatment offered under 18 U.S.C. § 3621(e)(2)(B), which may result in a reduction of sentence). However, individualized assessments need to be conducted using common criteria, in order to promote operational consistency and equitable treatment of the offenders. The BOP intends to develop criteria, in conjunction with the Department, to use to evaluate which offenders should be returned to secure custody. The criteria will likely include the inmate's adjustment while on home confinement, program participation in the community (e.g. jobs or vocational training),

whether or not there are programs to benefit the inmate that are delivered at BOP facilities, as well as the length of time remaining on the sentence.

Sentence length is likely to be a significant factor, as the more time that remains will provide the agency a more meaningful opportunity to provide programming and services to the offender in a secure facility. The nature of the sentence imposed, the interests of the prosecuting U.S. Attorneys' Office, the potential impact on any victims or witnesses, and deterrence are other potential factors for the criteria BOP would develop. It is likely that inmates that have longer terms remaining would be returned to secure custody, while those with shorter terms left who are doing well in their current placement would be allowed to remain there, subject to the supervisory conditions described above.

The management of inmates on Home Confinement since the beginning of the COVID-19 pandemic, despite numerous challenges, has been robust as the BOP's community confinement population has reached its highest in recent history. As of December 6, 2021:

- A total of 35,277 inmates placed on home confinement through all authorities (i.e. section 3624(c)(2), Elderly Offender Pilot, and CARES Act placements) since March 26, 2020.

- There are 7730 inmates currently on home confinement.

- 4879 of these inmates have been placed on home confinement pursuant to the CARES Act.

- 231 of the inmates currently on home confinement were placed under the Elderly Offender authority.

- 2830 inmates on CARES Act Home Confinement have release dates in more than 12 months;

  2160 inmates have release dates more than 18 months;
  359 inmates have release dates in 5 years or more; and
  18 inmates have release dates in 10 years or more.

As of November 5, 2021, 289 inmates on CARES Act Home Confinement have been returned to secure custody for violations or new crimes:

- 152 were returned due to misconduct in violation of program rules (alcohol use & drug use);

- 49 were returned after escape;

- 9 for new criminal conduct (six drug related, one violence and firearms, one escape with prosecution, and one smuggling non-citizens);

- The remainder were returned for technical violations (for example, non-compliance with monitoring check-in requirements).

This data demonstrates that inmates placed on longer term home confinement under the CARES Act can be and have been successfully managed, with a small percentage of inmates needing to be returned to secure custody for disciplinary reasons.[5]

If the January 15, 2021 OLC opinion remains in effect, once the covered emergency period is declared over, the BOP will work to bring offenders back into secure custody consistent with relevant existing authorities.[6]   However, inmates that do not qualify under these limited authorities would be brought back into a secure facility.

**Conclusion**

As noted above, the CARES Act is silent as to as any required action once the covered emergency period concludes.  Given the ambiguity of the CARES Act, existing statutory authorities supporting BOP discretion in designations, other examples of Congressional support for utilization of longer terms of home confinement, operational efficiencies for the BOP, and the potential benefit to appropriate individual offenders, their families, and their communities, BOP believes that OLC should revise its view to give BOP discretion over the placements of prisoners in CARES Act home confinement.  Thank you for your consideration of this matter.

---

[5] Additional observation and research should be conducted to determine if this very low level of recidivism can be maintained, or if it was affected by the unique external circumstances caused by the global pandemic.
[6] For example, inmates meeting the terms of section 3624 (c)(2), would remain on home confinement; eligible inmates may be transferred to a residential reentry center consistent with 18 U.S.C. 3621 (c)(1); qualifying inmates would be considered under the FSA/Elderly Offender Pilot; and some inmates may be considered for a furlough for a limited time under 18 U.S.C. § 3622.