# EXHIBIT 5

**Third Declaration of Eva Cardoza**

I, Eva Cardoza, hereby declare pursuant to 28 U.S.C. § 1746:

1. My name is Eva Cardoza. I am 45 years old. I was released on home confinement under the CARES Act in May 2020. Before my release, I was housed at the minimum-security women's Camp at FCI Danbury.

2. While in prison, I participated in numerous rehabilitative programs. I had an apprenticeship with the prison laundry and worked with the commissary, trust fund, warehouse, and electric teams.

3. After COVID hit at FCI Danbury in spring 2020, I learned from staff that I would be released to home confinement under the CARES Act. Other women in the Camp were also told they were approved for home confinement. BOP staff from the Unit Team at the Camp (the counselor, case manager, and Camp secretary) told us we were going home to stay for the rest of our sentences. They said we would only be brought back to prison if we violated the rules.

4. When I was approved for home confinement, staff said: "You'll do your time there." Staff told me "Congratulations" and "don't do anything that will bring you back." Staff never said that I could be brought back to prison for any reason other than me breaking a rule. Staff had me sign home confinement paperwork before I was released.

5. I was approved for home confinement at around the same time as many other women from the Camp. We all talked with each other. The other women also understood from BOP staff that they were going to be on home confinement for the rest of their sentences and would be brought back to prison only if they violated the rules. Women shared their understanding with me. Some women, like me, had a lot of time left on their sentences.

1

We were all thankful we were being allowed to serve the rest of our time at home. We viewed this as a real blessing.

6. Since I've been in BOP custody, I've understood that home confinement is the final stage of your time in BOP custody and is supposed to prepare you for being in the community. I've understood that there is a difference between home confinement—where you remain at home until your time with BOP is done—and a furlough, where you usually come back to prison.

7. I understood from what BOP staff communicated to me and other women housed at the Camp that I would remain on home confinement for the rest of my sentence unless I violated a rule of the home confinement program. I relied on this promise when I got home in the choices I made to reestablish a strong bond with my daughter, become engaged to my fiancé, and become a mother to his children. My fiancé and our children, and my mother, relied on an understanding that I would remain home for the rest of my sentence unless I engaged in misconduct.

8. During my time in BOP custody, I've never heard of someone being brought back to prison from home confinement except for when BOP says they violated a rule.

9. After I was released, I went to the Bronx to get my ankle bracelet on. Staff told me the rules of home confinement—I had to get permission to leave the house, answer all phone calls from the halfway house, and be tested for drug and alcohol use.

10. While on home confinement, after initially living with my mother and daughter (now 15), I lived in Walden, New York with my fiancé (Eric Alvarez), my daughter, Eric's three young children (now ages 14, 12, and 10), and Eric's older son (age 26) who has severe disabilities. I also helped care for my elderly mother, who has diabetes.

11. During my time on home confinement, I cared for Eric, who has a lot of health problems including coronary artery disease, diabetes, asthma, and high blood pressure, among other conditions. My fiancé has a heart attack and stroke history. He has been on disability for the past two decades and is unable to exert himself or lift anything more than five pounds. Eric's medical conditions often make him so weak that he cannot care for himself or even get out of bed. I kept track of his medications and cooked for him. When he was really weak from his conditions, I helped to bathe and feed him.

12. Due to his health conditions, Eric had trouble caring for our children. I helped the children get ready for school and helped them with their schoolwork. I also cooked for everyone and took care of all the housework.

13. I also did the housework and cooking for my elderly mother who suffers from diabetes and lives alone.

14. During my time on home confinement, I was able to re-establish a strong bond with my daughter after my being incarcerated for so many years. When I got home, my daughter was 13 and entering her teenage years. I was really grateful to be able to be a source of comfort and support for her.

15. I suffer from asthma, seizures, and post-traumatic stress disorder (PTSD). My PTSD comes from the abuse I have suffered in my life. As a little girl, I saw my father beat and yell at my mother and I later suffered the same abuse from him. As a teenager and young woman, I was in multiple physically abusive relationships with men. During one attack, my abuser struck me in the head and I suffered a serious head injury. I was also the victim of rape.

16. Following my head injury, I began having seizures that get worse with anxiety and stress. I am currently prescribed carbamazepine to help control the seizures, but since being re-incarcerated, I have had seizures more frequently.

17. While on home confinement, I was supervised by the Bronx Community Reentry Center (RRC), which was 1.5 to 2 hours from my home in Walden, NY. I was required to report to the RRC between one and four times per month. I went to every appointment at the RRC and often spent more than $200 in cab fare.

18. During my time on home confinement, I was tested at least once per month by the RRC for drug and alcohol use.

19. Before June 2021, I had never received an incident report while on home confinement. I never left my home without permission from the RRC.

20. On June 7, 2021, RRC staff told me that a urine sample they collected from me on June 1, 2021, had tested positive for marijuana.

21. When I got to the RRC, staff gave me an incident report. Around an hour after receiving the incident report, I met with RRC staff to discuss the incident.

22. After this meeting, RRC staff told me that they were recommending a sanction of a loss of 41 days of good time credit and that they were not recommending re-imprisonment.

23. On June 8, 2022, I was required to again report to the RRC, where staff met with me again. Staff later instructed me to return to the RRC with a change of clothes.

24. When I returned, I was told I would have to stay at the RRC for some time. I was not told I was being sent back to prison.

25. On June 14, 2021, U.S. Marshals came to the RRC and brought me to MDC Brooklyn.

26. On August 25, 2021, I was transferred to FCI Danbury, where I have been since.

27. I never had a chance to speak to a DHO or a BOP official prior to being re-imprisoned.

28. I did not receive the evidence underlying the incident report. I did not have a chance to present witnesses or evidence in support of remaining on home confinement or to cross-examine witnesses. No one told me I was at risk of being sent back to prison and I wasn't given the chance to talk to the person making this decision. No one told me why I was being sent back to prison or what evidence BOP looked at in making this decision.

29. Once I was re-imprisoned, I was not told how long I would have to remain in prison. One officer who worked in the processing department told me that my sanction was 90 days. Another prison staff member told me that my first ticket should not mean I should have to be re-imprisoned. My unit manager at FCI Danbury then told me that I would remain in prison until the end of my sentence in December 2024. Hearing this was devastating and I still feel like I have not been provided clarity on my home confinement revocation.

30. Since I was re-incarcerated, my daughter and stepchildren have been living with my fiancé.

31. Soon after the BOP revoked my home confinement and took me back into custody, my daughter (then 14 years old) was the victim of a serious and traumatic sexual assault. It has been incredibly difficult for me and my family that I have not been able to be with my daughter during this time to support her. My daughter's perpetrator has since been charged with and tried for the offense. Both my daughter and my fiancé had to give testimony at trial about this traumatic event. In July 2022, my child had to face her assailant again to give a victim impact statement. She had to face all that without my being there to support her. Since the assault and my being sent back to prison, my daughter's mental and physical health has deteriorated. She has even tried to hurt herself.

During my time on home confinement, I became a primary source of support for her so not having me there to support her during this incredibly difficult period of her life has only made the situation that much harder.

32. Since my re-incarceration, my fiancé Eric has struggled to care for himself and our children due to his health issues. He often cannot even take care of his own needs, much less the needs of our children.

33. Eric's health conditions have recently gotten even worse. In June 2022, the pain in his stomach got so bad he had trouble getting out of bed. He went to the emergency room for tests. Earlier this month, Eric learned he has colon cancer. This news is devastating to me. Eric is suffering so much and can't give the children the care they need. My daughter found him on the floor in the bathroom unable to get up because of the pain. She is terrified he is going to die and leave her alone. I worry every night that Eric will have a heart attack and the children will find him dead. I always have to talk to him first thing in the morning or I go into a complete panic. It pains me so much not to be home to help care for him and the kids.

34. My mother, who lives alone and has diabetes, has also been left without a reliable caregiver. The only help she receives is from my sister, who is able to help her from time to time but not on a regular basis like I was able to.

35. Since my return to prison, I've suffered extreme stress, anxiety, depression, and anguish from not being able to take care of my family and support my daughter while she goes through one of the most traumatic events she will ever experience and my fiancé as his health gets worse. Due to the stress, I've had seizures more frequently, which has taken a huge toll on my physical and mental health. I try to distract myself by working long hours

for housekeeping services at the prison, often working 5 A.M. to 9 P.M. despite my seizures and health issues, but sometimes it's difficult to even get out of bed to take care of myself. I try to keep my mind occupied by serving as head orderly for the counselor at the Camp and by participating in classes. My mind is often spinning and I am frequently in a state of panic.

36. My most recent seizure was during the night on August 13, 2022. Other inmates told me that I had passed out for awhile. When I came out of the seizure, I was really tired and couldn't think straight. My left side was droopy. I sought medical care and they told me to just return to the dorm.

37. My family is suffering without me. I am suffering knowing I am not able to support them and help take care of them while I'm in prison.

38. If I were released, I would be able to care for and support my family. I would live with my fiancé and our children in Walden, NY, and I would be able to make sure family is taken care of. I would also be able seek medical care with a specialist for my seizures. Prior to my re-incarceration, I was in the process of obtaining care at Crystal Run Healthcare in Middletown, New York where they have a neurology department.

39. When I was detained on June 14, 2021 the U.S. Marshals would not allow me to take my incident report and appeal paperwork with me from the RRC to MDC Brooklyn. I wrote to BOP staff on August 5, 2021, requesting a copy of my incident report and appeal paperwork.

40. BOP staff responded on August 13, 2021 stating that the RRC had provided me with a copy of my incident report and appeal paperwork prior to my being detained. But I was

not allowed to take the documents with me to MDC Brooklyn, and while at MDC Brooklyn I was never given a copy of the documents.

41. When I got to FCI Danbury, I again requested my incident report and appeals paperwork. Staff at FCI Danbury told me that the time for me to file an appeal had passed and did not provide me with the materials.

42. Although I was never given a BP-10 form for the appeal, I submitted a written appeal on plain paper to the Regional Director on September 21, 2021. I never received a response from the Regional Director.

43. On May 31, 2022, I mailed an appeal on a BP-11 form to the General Counsel at BOP's Central Office. On July 30, 2022, my case manager at FCI Danbury brought me a response to the appeal that I had mailed to the General Counsel. My BP-11 was stamped as received on July 6, 2022. The typed response said that the grievance was being rejected because it should have been submitted to the Institution. However, the response also included a typed statement that appeals relating to 100 and 200-level violations should be submitted to the Regional Director. That sentence was marked on both sides by a handwritten star—which seems to indicate an instruction to submit an appeal to the Regional Director. The response was dated July 8, 2022 but staff did not give me the response until July 30, 2022. Staff did not tell me why they waited until July 30, 2022 to give me the response to my BP-11.

I have reviewed the information contained in this declaration. I declare under the pains and penalties of perjury that the contents are true and correct to the best of my knowledge. I authorize use of my electronic signature to sign this declaration.

Dated: August 16, 2022                                         */s/ Eva Cardoza*
                                                                Eva Cardoza