UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EVA CARDOZA, | : | Case No. 22-cv-591(SVN) |
|     Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| TIMETHEA PULLEN et al., | : | |
|     Respondents. | : | August 31, 2022 |

MEMORANDUM IN SUPPORT OF SECOND MOTION TO DISMISS

Pursuant to Local Civil Rule 7(a), the respondents respectfully submit this memorandum in support of their second motion to dismiss the above-captioned habeas corpus petition. As set forth in greater detail below, the petitioner's amended petition fails to cure the deficiencies that were present in her original petition, which the court dismissed on August 9, 2022. See Cardoza v. Pullen, No. 3:22-CV-00591 (SVN), 2022 WL 3212408 (D. Conn. Aug. 9, 2022). The respondents incorporate by reference the arguments they made in their memorandum in support of their original motion to dismiss (see docket no. 12-1 (hereinafter "Resps.' First Mem."), as well as their reply (see docket no. 21), in addition to the arguments made in this memorandum.

I. **BACKGROUND**

The underlying facts and procedural history are mostly unchanged since the respondents' prior filing (see Resps.' First Mem., at 1-3), and the respondents will not repeat that background here. In terms of subsequent history, on August 9, 2022, the court granted the respondents' motion to dismiss the original habeas petition in its entirety, with leave for the petitioner to replead. (See docket no. 32.) On August 17, 2022, the

petitioner availed herself of her right to replead, filing the instant amended petition, which contains two counts: (1) a violation of procedural due process in connection with the BOP's decision to redesignate her to custody at FCI Danbury; and (2) that she is entitled to declaratory relief.[1]  (See docket no. 33.)

As with her original petition, the petitioner again requested that the court grant her enlargement as a provisional remedy during the pendency of her petition.  On August 22, 2022, the court granted the petitioner's request, granting her bail while the operative habeas petition is pending.  (See docket no. 39.)

## II.     ARGUMENT

### A.     Exhaustion Under the PLRA

In the court's order granting the respondents' first motion to dismiss the original habeas petition, the court disagreed with the respondents' position that the petitioner was required to exhaust her administrative remedies under the Prison Litigation Reform Act (the "PLRA").  See Cardoza, 2022 WL 3212408, at *4.  The respondents do not attempt to relitigate that issue here and understand the court's conclusion that it is bound by Second Circuit's decision in Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 634 (2d Cir. 2001).

Nevertheless, for purposes of the record and for preservation of their arguments on appeal, they incorporate by reference their prior arguments in favor of dismissal for

---

[1]The petitioner did not replead any of the other counts contains in the original habeas petition that were dismissed, namely: a violation of substantive due process; an Eighth Amendment violation; that the BOP violated its own regulations in remanding the petitioner; and a violation of the Rehabilitation Act.

2

PLRA non-exhaustion. Specifically, the respondents contend that 42 U.S.C. § 1997e(a), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted," requires dismissal of the amended petition.

    B.    The Amended Petition Does Not Cure the Original Petition's Legal Deficiencies as to an "Implicit Promise" or Otherwise

In its order granting the respondents' first motion to dismiss, the court concluded that the petitioner must plausibly allege both that: (1) the "extent and conditions" of the petitioner's "liberty" while on home confinement are sufficiently alike to those experienced by the parolees and pre-parolees granted due process protections in Morrissey v. Brewer, 408 U.S. 471 (1972), and Young v. Harper, 520 U.S. 143 (1997); and (2) there existed an "implicit promise" that the petitioner would remain on home confinement absent a violation of BOP or facility rules. See Cardoza, 2022 WL 3212408, at *10.

Applying the court's framework for analyzing the petitioner's claim, the amended petition fails on both counts. As with statutory exhaustion, the respondents acknowledge that the court has concluded that the original petition plausibly alleged a deprivation sufficiently similar to those in Morrissey and Young to state a claim, provided the petitioner could adequately allege an "implicit promise." See Cardoza, 2022 WL 3212408, at *10. Although the respondents disagree,[2] they will not brief that issue again

---

[2] The respondents do not concede, however, that home confinement is sufficiently similar to parole or pre-parole so as to trigger due process protections. See Domka v.

3

at length here and instead will focus on issues surrounding the BOP's alleged "implicit promise" to the petitioner.

In repleading, the petitioner explicitly alleges that she was the recipient of an implicit promise that she would "remain on home confinement until the end of [her] sentence absent a violation of the terms of home confinement." (Am. Pet., ¶12.) That allegation alone, of course, is not sufficient; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); but the petitioner also alleges:

> The implicit promise of remaining on home confinement absent a violation is derived from an analysis of the statutes and regulations governing home confinement, public communications from BOP leadership, the agreements the BOP requires people to sign when they commence home confinement, communications from BOP staff to individuals before they commence home confinement, communications from the Residential Reentry Centers (RRCs) to individuals they are supervising on home confinement, and the actual practices of the BOP with respect to re-imprisoning people on home confinement.

(Am. Pet., ¶13.) The cited sources, however, do not support the petitioner's claim, because they are not the types of materials that have been held to create an implicit promise, and even if they were, they do not actually make a promise to the petitioner that she could only be remanded upon violating the terms of her pre-release custody.

In its order dismissing the original petition, the court observed that "[i]n Morrissey, the Court looked more generally to the 'essence' of parole . . . and the parole

---

Portage Cnty., Wis., 523 F.3d 776, 781 (7th Cir. 2008) (distinguishing between a probationer and an inmate having to "serve out his remaining time of confinement in a different location").

4

system's concern with parole violations . . . to find evidence of the implicit promise." Cardoza, 2022 WL 3212408, at *12 (internal quotation marks omitted). But Supreme Court and Second Circuit cases subsequent to Morrissey consistently have looked to statutes and regulations that set out the powers and obligations of the government entities that are purportedly restricting individual liberty in the criminal justice context. For example, in Meachum v. Fano, 427 U.S. 215, 227 & n.7 (1976), the Court's emphasis in evaluating "Massachusetts law" was exclusively on the contents of the Massachusetts General Laws. A few years later, in Pugliese v. Nelson, 617 F.2d 916, 922 (2d Cir. 1980), the Second Circuit observed that "[t]o qualify as constitutionally protectible 'liberty,' the prisoner's interest must be either one that is assured by statute, judicial decree or regulation . . . or one that he would normally expect to have as a matter of custom and practice or of fundamental decency and fairness" (citations omitted). In Young, the Supreme Court rejected an argument by the State that a pre-parolee's continued participation in that program was subject to "extrinsic events" (namely, the Governor's decision on parole), but it did so because the cited procedure went into effect after the pre-parolee's return to prison. 520 U.S. 143, 150-51 (1997). And finally, in Holcomb v. Lykens, 337 F.3d 217, 221-22 (2d Cir. 2003), the court considered the due process implications surrounding Vermont's extended furlough program. In comparing that program to parole and pre-parole, the court analyzed regulations dealing with revocation of furlough, which provided certain procedural safeguards, ultimately insinuating that the construction of those regulations may well prove dispositive of the "implicit promise" inquiry. Id. at 223.

Moreover, the applicable case law, beginning even with Morrissey itself, concerns itself principally with authority, that is, whether the government's authority to act is in some way constrained. Morrissey seemed to contemplate this restriction as inherent in the parole system itself; see 408 U.S. at 478-79 ("The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules" (emphasis added)). The cases that followed similarly spoke in terms of the scope of government authority. In Meachum, the Court found no protectable liberty interest because "Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct. Insofar as we are advised, transfers between Massachusetts prisons are not conditioned upon the occurrence of specified events. On the contrary, transfer in a wide variety of circumstances is vested in prison officials." Meachum, 427 U.S. at 226-27. Finally, in Young, while the Court criticized as "illusory" the State's argument in that case that it should prevail since "the Board had authority to reimprison a preparolee for any reason or for no reason"; 520 U.S. at 151 n.3; the Court's disagreement was not because the element of authority was unimportant. Rather, it was because the petitioners there could "point to nothing to support their contention" on the Board authority question in the first instance. Id.

The Second Circuit has followed suit, emphasizing government authority in both the period following Morrissey and in more recent times. For example, in Pugliese, 617 F.2d at 922, the Second Circuit held that a "protected liberty interest is created, for

6

example, where the inmate currently enjoys or may reasonably expect to enjoy an important and substantial benefit upon his compliance with or the occurrence of certain conditions, <u>which may be withdrawn only for good cause</u>" (emphasis added).  And in <u>Holcomb</u>, 337 F.3d at 221-22, while analyzing Vermont's the procedural protections set forth in Vermont's furlough regulations, the court observed that "it is not clear whether [those regulations] apply to the <u>refusal to renew</u> extended furlough." <u>Id.</u> at 222-23 (emphasis in original).  The court thought an answer to that question critical "to determine whether Vermont's extended furlough is sufficiently similar to <u>Morrissey's</u> characterization of parole to constitute a liberty interest requiring due process protection." <u>Id.</u> at 223.  The court concluded:

> If extended furlough must be renewed every fifteen days absent a finding of improper behavior, there is a good argument to be made that the furloughee has a reasonable expectation that he or she will maintain his or her status so long as he or she behaves properly. If, on the other hand, DOC may decline to renew extended furlough entirely at its discretion, the argument that the furloughee has such an expectation is severely, perhaps fatally, weakened.

<u>Id.</u>

The amended petition in this case, however, does not identify a statute or regulation (or even a policy of general applicability) that indicates that an individual released on home confinement can <u>only</u> be remanded on a proof of misconduct.  Instead:

- The amended petition points to the text of the CARES Act and the general legislative purpose of home confinement, but those provisions do nothing to restrict BOP's unreviewable authority to designate the location where an inmate will serve her sentence, including from pre-release custody to custodial incarceration.  <u>See</u> 18 U.S.C.

7

§ 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment."); § 3621(b)(5) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); § 3624(c)(4) (governing prerelease custody like home confinement, "Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621."); 28 C.F.R. § 570.22 ("Inmates will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. section 3621(b), determined on an individual basis . . . .).

- The petitioner identifies two memoranda from BOP leadership, which either say literally nothing about remanding inmates in BOP pre-release custody to custodial incarceration (as in the Carvajal testimony) or emphasize that BOP is entitled to make custodial decisions based on "penological need" (as in the Hyle Memorandum, which uses the word "discretion" ten times in seven pages). In neither exhibit does anyone at BOP ever represent that inmates can only be remanded under specific circumstances or upon a specific finding of misconduct, even if they reflect the altogether-uncontroversial position that inmates on home confinement are not typically remanded as a matter of course. See, e.g., Meachum, 427 U.S. at 228.

- The amended petition refers to agreements signed by inmates when they are released from custodial incarceration and/or placed on home confinement. Again, these agreements do nothing to limit BOP discretion in remanding inmates who have been released to home confinement, and they do not promise that an inmate will be able to remain on home confinement for any period of time.

- The amended petition includes new allegations that unnamed BOP staff at Danbury indicated to the petitioner that she would be remanded only if she broke the rules of her home confinement. (See Am. Pet., ¶¶27-28.) The respondents do not believe that staff commentary on their expectations or understanding of BOP remand authority (even if taken as true for purposes of this motion) are relevant or binding on the BOP broadly. But even setting that aside, these comments as alleged do not reflect a promise that the petitioner could not be remanded absent proof of a violation of rules.

In sum, the amended petition adds allegations that use the words "implicit promise" and points to things that simply do not answer the relevant question of what the BOP has promised home-confinement designees about their designations. The short answer is nothing, and absent identifying some greater source that would otherwise restrict BOP authority to remand home-confinement designees to custody, the petitioner has no greater rights – at least as it pertains to what the government has promised her – than those inmates in Meachum, even if the "size" of the deprivation in these types of cases is perhaps greater.

### III.   CONCLUSION

The amended petition attempts to cure the original petition's failure to plausibly allege a liberty interest in the petitioner's home confinement by supplementing her petition with details regarding supposed expectations in the duration of the petitioner's pre-release custody. But the amended petition should suffer the same fate as the original petition because the petitioner has not and cannot allege a promise, either explicit or implicit, that she could not be remanded absent specific misconduct.

Respectfully submitted,

Vanessa Roberts Avery
United States Attorney

\_\_\_/s/_____
John W. Larson (ct28797)
Assistant United States Attorney
District of Connecticut
450 Main Street, Room 328
Hartford, CT 06103
T:  (860) 947-1101
F:  (860) 760-7979
john.larson@usdoj.gov